JAMES NEVILLE SAUL (OSB #152809)
jsaul@lclark.edu
Earthrise Law Center
10015 S.W. Terwilliger Boulevard
Portland, OR 97219
(503) 768-6929 | Phone
(503) 768-6642 | Fax

JANETTE K. BRIMMER (WSB #41271)
jbrimmer@earthjustice.org
*[Appearing Pro Hac Vice]*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax

JENNIFER C. CHAVEZ (DCB #493421)
jchavez@earthjustice.org
*[Appearing Pro Hac Vice]*
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, D.C. 20036
(202) 667-4500 | Phone
(202) 667-2356 | Fax

*Attorneys for [Proposed] Defendant-Intervenor Columbia Riverkeeper*

HONORABLE MICHAEL MOSMAN

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON CATTLEMEN'S ASSOCIATION,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v. | Case No. 3:19-cv-00564-AC<br><br>COLUMBIA RIVERKEEPER'S AMICUS BRIEF IN OPPOSITION TO PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION |

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; ANDREW
WHEELER, in his official capacity as
Administrator of the Environmental Protection
Agency; UNITED STATES ARMY CORPS OF
ENGINEERS, and R.D. JAMES, in his official
capacity as Assistant Secretary for Civil Works,
Department of the Army,

                    Defendants.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

IDENTITY OF AMICUS CURIAE PARTY ................................................................2

ARGUMENT ................................................................................................................3

I.      THE STANDARD FOR INJUNCTIVE RELIEF REQUIRES PLAINTIFF TO
        DEMONSTRATE FOUR FACTORS. .................................................................3

II.     THE RULE CONFORMS TO LEGISLATIVE AND CASE HISTORY THAT
        DICTATE THE ACT'S PROTECTIONS EXTEND BEYOND WATERS THAT
        ARE NAVIGABLE IN FACT. ..............................................................................4

        A.      The Act's Purpose Is To Restore And Protect The Water Resources Of
                The United States. ....................................................................................4

        B.      Courts Have Consistently Supported Broad Application Of The Act. ....5

        C.      Recent Supreme Court Decisions Led The Federal Agencies To Develop
                A Rule To Ensure Congress' Protective Vision Was Realized Within The
                Direction Of The Court. ...........................................................................6

        D.      The Rule Protects Waters That Are Scientifically Demonstrated To Have
                A Significant Impact On Navigable Waters. ............................................8

III.    PLAINTIFF HAS NOT DEMONSTRATED AND CANNOT DEMONSTRATE
        A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE RULE
        COMPLIES WITH THE ACT BY PROTECTING WATERS WITH A
        SIGNIFICANT NEXUS TO DOWNSTREAM WATERS.................................10

        A.      To Succeed On The Merits Plaintiff Must Demonstrate That The Rule Is
                Contrary To Law, Arbitrary And Capricious, Or An Abuse Of Discretion. .........10

        B.      The Rule's Reliance On The Significant-Nexus Test Comports With
                Supreme Court Case Law. ......................................................................11

        C.      The Scientific Record For The Rule Overwhelmingly Confirms That
                Tributaries And Adjacent Waters Significantly Influence Downstream
                Waters. ...................................................................................................15

                1.      Tributaries ...................................................................................15

                2.      Adjacent Waters...........................................................................20

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION            i

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

D.    Plaintiff's Implications That Tributaries And Adjacent Waters Are Not Properly Protected Under The Act Are Contrary To Law And Science...............23

    1.    Tributaries ..................................................................................23

    2.    Adjacent waters.........................................................................24

IV.    PLAINTIFF DOES NOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON ITS CONSTITUTIONAL CLAIMS NOR EVEN SUPPORT THEM ADEQUATELY TO RAISE A SERIOUS QUESTION. ..................................................25

    A.    There Is No Commerce Clause Or Tenth Amendment Violation Because The Rule Covers Waters That Have A Significant Nexus To Navigable Waters. ...............................................................................................25

    B.    There Is No Due Process Violation Because The Rule Is Not Vague. ..................27

V.    THE FINAL RULE DID NOT RUN AFOUL OF NOTICE AND COMMENT REQUIREMENTS.............................................................................................29

VI.    PLAINTIFFS HAVE FAILED TO SHOW HARM, MUCH LESS IRREPARABLE HARM, FROM THE RULE.................................................................30

VII.    THE BALANCE OF HARM TIPS SHARPLY IN FAVOR OF DENYING THE REQUEST FOR INJUNCTIVE RELIEF AND THE PUBLIC INTEREST IS IN PROTECTING PUBLIC WATER RESOURCES. ........................................................34

CONCLUSION....................................................................................................36

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION     ii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...................................................................3, 30

*American Paper Inst., Inc. v. Envtl. Pro. Agency*,
    890 F.2d 869 (7th Cir. 1989) ...........................................................................4

*Assoc. Gen'l Contractors of Cal., Inc. v. Coal. for Economic Equity*,
    950 F.2d 1401 (9th Cir. 1991) ....................................................................3, 26

*Atlantic Coast Demolition v. Bd. of Chosen Freeholders of Atlantic City*,
    893 F.Supp. 301 (D.N.J. 1995) ........................................................................4

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)........................................................................................10

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)........................................................................................11

*City of Milwaukee v. Illinois and Michigan*,
    451 U.S. 304 (1981)..........................................................................................5

*Colorado R. Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985) .........................................................................30

*Duarte Nursery, Inc. v. U.S. Army Corps of Engineers*,
    17 F. Supp. 3d 1013 (E.D. Cal. 2014).............................................................32

*Envtl. Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) .......................................................................29

*Envtl. Pro. Agency v. California*,
    426 U.S. 200 (1976)..........................................................................................4

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984) .........................................................................30

*Harper v. Crockett*,
    868 F.Supp. 1557 (E.D. Ark. 1994).................................................................27

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION

iii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Idaho Conserv. League v. Atlanta Gold Corp.*,
879 F.Supp. 2d 1148 (D. Id. 2012) ..........................................................35

*Illinois v. City of Milwaukee*,
406 U.S. 91 (1972).............................................................................25

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987).............................................................................26

*Kolender v. Lawson*,
461 U.S. 352 (1983)........................................................................27, 28

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
*Connaughton*,
752 F.3d 755 (9th Cir. 2014) ....................................................................3

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007).............................................................................28

*Marks v. United States*,
430 U.S. 188, 97 S.Ct. 990 (1977).........................................................7, 12, 15

*Mazurek v. Armstrong*,
510 U.S. 968 (1997).............................................................................3

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981)..............................................................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................................10

*N. Cal. River Watch v. City of Healdsburg*,
496 F.3d 993 (9th Cir. 2007) ...................................................................14

*N. Cal. River Watch v. Wilcox*,
633 F.3d 766 (9th Cir. 2011) ...................................................................14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012).............................................................................24

*Oregon State Public Interest Res. Group v. Pacific Coast Seafoods Col*,
374 F.Supp. 2d 902 (D. Or. 2005) ...............................................................35

*PPL Montana, LLC v. Montana*,
565 U.S. 576 (2012).............................................................................24

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION      iv

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Precon Dev. Corp., Inc. v. United States Army Corps of Engineers*,
　　633 F.3d 278 (4th Cir. 2011) .................................................15

*Rapanos v. United States*,
　　547 U.S. 715 (2006).................................................. *passim*

*Shell Oil Co. v. EPA*,
　　950 F.2d 741 (D.C. Cir. 1991).................................................29

*Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*,
　　531 U.S. 159 (2001).................................................6, 11

*Southeast Alaska Conserv. Council v. U.S. Army Corps of Engineers*,
　　472 F.3d 1097 (9th Cir. 2006) .................................................35

*U.S. v. Hubenka*,
　　438 F.3d 1026 (10th Cir. 2006) .................................................6

*U.S. v. HVI Cat Canyon, Inc.*,
　　213 F.Supp.3d 1249 (C.D. Ca. 2016) .................................................6

*United States v. Ashland Oil & Transp. Co.*,
　　504 F.2d 1317 (6th Cir. 1974) .................................................5, 25

*United States v. Cundiff*,
　　555 F.3d 200 (6th Cir. 2009) .................................................14

*United States v. Donovan*,
　　661 F.3d 174 (3d Cir. 2011).................................................15

*United States v. Gerke*,
　　464 F.3d 723 (7th Cir. 2006) .................................................14

*United States v. Johnson*,
　　467 F.3d 56 (1st Cir. 2006).................................................14

*United States v. LaPant*,
　　No. 2:16-CV-01498-KJM-DB, 2019 WL 1978810 (E.D. Cal. May 3, 2019) .................................................32

*United States v. Lucas*,
　　516 F.3d 316 (5th Cir. 2008) .................................................15, 28

*United States v. Riverside Bayview Homes, Inc.*,
　　474 U.S. 121 (1985).................................................. *passim*

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION　　　v

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*United States v. Robison*,
    505 F.3d 1208 (11th Cir. 2007) ..................................................................14

*United States v. Williams*,
    553 U.S. 285 (2008) .........................................................................................27

*Upstate Forever v. Kinder Morgan Energy Partners, L.P.*,
    887 F.3d 637 (4th Cir. 2018) ...........................................................................15

*Utah v. United States*,
    403 U.S. 9 (1971) ............................................................................................25

*Veteran's Justice Grp., LLC v. Sec'y of Veterans Affairs*,
    818 F.3d 1336 (Fed. Cir. 2016) .......................................................................28

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) .........................................................................................27

**Statutes**

5 U.S.C. § 553(b)(3) ...............................................................................................28

5 U.S.C. § 706(2)(A) ..............................................................................................10

33 U.S.C. § 1251 ......................................................................................................4

33 U.S.C. §1311(a) .................................................................................................33

33 U.S.C. § 1313(c) ..................................................................................................5

33 U.S.C. § 1342 ....................................................................................................33

33 U.S.C. § 1344(a) ...............................................................................................33

33 U.S.C. § 1370 ....................................................................................................26

**Regulations**

33 C.F.R. 328.3(a)(1)-(3) .........................................................................................9

33 C.F.R. § 328.3(a)(5) ............................................................................................8

33 C.F.R. § 328.3(a)(6) ............................................................................................9

33 C.F.R. § 328.3(a)(6). .........................................................................................19

33 C.F.R. § (c)(1). ..................................................................................................19

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION  vi

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

33 C.F.R. § 328.3(a)(7)-(8) .............................................................9

33 U.S.C. § 328.3(c)(3) .............................................................15, 22, 28

40 C.F.R. 230.3(s)(2)(iv)(B) .............................................................32

40 C.F.R. pt. 122 .............................................................33

40 C.F.R. pt. 230 .............................................................34

**Other Sources**

118 Cong. Rec. 33,756–57 (Oct. 4, 1972) .............................................................4

79 Fed. Reg. 22,188 (April 21, 2014) .............................................................29

80 Fed. Reg. 37,054 (June 29, 2015) ............................................................. *passim*

84 Fed. Reg. 4154 (Feb. 14, 2019) .............................................................2, 7

H.R. Rep. No. 92-911 (1972) .............................................................4

S. Rep. No. 92-414 (1971) .............................................................4, 5

U.S. Const., art. I, § 8 .............................................................24

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION      vii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

# INTRODUCTION

We rely on clean water for drinking, to irrigate crops, for livestock, for swimming and fishing, and as habitat for wildlife. Since 1972, the Clean Water Act, one of our earliest and most important environmental laws, has helped restore and protect our Nation's waters. This case concerns challenges to a federal rule defining the scope of those protections; challenges that seek to narrow or exclude waters to be protected from pollution or destruction.

Plaintiff seeks to enjoin a properly enacted rule under the Clean Water Act (the "Act"), promulgated in compliance with the requirements of the Act and direction of the U.S. Supreme Court, entitled "Clean Water Rule: Definition of 'Waters of the United States.'" 80 Fed. Reg. 37,054 (June 29, 2015) ("Rule"). The Rule is based upon and supported by detailed, ample, and consensus science regarding waters of the U.S.

Plaintiff's request for injunctive relief should be denied. Plaintiff's claims are contrary to law and not likely to succeed and plaintiff has not demonstrated (or even described) harm to itself or members that is concrete or imminent, or even described as to any person or waterbody, that will result from application of the Rule. Further, the balance of harms tips sharply away from plaintiff's claims, as an injunction may expose waterbodies in Oregon--public resources that supply drinking water, irrigation, recreation and wildlife values--to damage or destruction from dredging, filling, or pollution discharges. These harms are indeed irreparable and many will be permanent, harming the public interest in clean and protected water resources and potentially harming downstream water users. By contrast, plaintiff's assertions of future financial consequences stemming from claimed delays in plans for private property are non-specific and

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          1

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

speculative. Amicus Curiae Columbia Riverkeeper, ("Riverkeeper"), respectfully requests that plaintiff's motion be denied.[1]

<center>IDENTITY OF AMICUS CURIAE PARTY</center>

Riverkeeper has worked for decades to fight water pollution and secure protections under the Act.[2] Riverkeeper is a non-profit organization, incorporated under the laws of Oregon, with approximately 15,000 members and supporters. Riverkeeper's mission is to restore and protect the water quality of the Columbia River and all life connected to it, from the headwaters to the Pacific Ocean. Strong and clear application of the Act's protections is integral to Riverkeeper achieving its goals for the Columbia River watershed. Riverkeeper submitted public comments on the proposed Rule, where Riverkeeper articulated its support for several of the 2015 Rule's specific provisions, including the jurisdictional-by-rule provisions at issue in this litigation.

Riverkeeper notes that the declarations filed in support of plaintiff's motion allege interests in Baker and Malheur Counties of Oregon, particularly an area that drains to the Powder River in Baker County. The Powder River is a tributary to the Snake River, itself one of the primary tributaries to the Columbia River. These are national public resources. Countless individuals, businesses, tribes, and towns downstream rely on these waters for drinking, for irrigation, for business, for fishing, for livestock, for fish and wildlife, and for recreation. The defendants will not be defending the Rule, given the Administration's actions to repeal and/or replace the Rule. *See, e.g.,* 84 Fed. Reg. 4154 (Feb. 14, 2019). Only Riverkeeper, on behalf of

---

[1] Riverkeeper files this brief in opposition to plaintiff's motion for injunctive relief in order to preserve arguments against a preliminary injunction, but Riverkeeper participates as amicus only because its timely motion to intervene was denied.

[2] Riverkeeper's interest in this case is described in the enclosed Declaration of Lauren Goldberg.

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION     2

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

citizens that support clean and protected waters, defends the Rule and provides this Court with the arguments and evidence supporting the rule and contrary to an injunction. A preliminary injunction that creates confusion over which Oregon waters may be protected under the Act and excludes waters from those protections--endangering them to being dredged, excavated, filled, or polluted--is contrary to the heart of Riverkeeper's mission and work and to the interests of each of Riverkeeper's members.

ARGUMENT

I.      THE STANDARD FOR INJUNCTIVE RELIEF REQUIRES PLAINTIFF TO DEMONSTRATE FOUR FACTORS.

A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The moving party must demonstrate all factors and do so with a "clear showing." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) and *Mazurek v. Armstrong,* 510 U.S. 968, 972 (1997). While the Ninth Circuit has explained that a party can, in some instances, establish the first element by raising and supporting "serious questions" going to the merits of the case, *Cottrell*, 632 F.3d at 1134-35, a moving party must still show a real and immediate threat of harm. *Assoc. Gen'l Contractors of Cal., Inc. v. Coal. for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991). Contrary to plaintiff's claim, the Ninth Circuit has noted that a plaintiff must show a "serious question"—a lesser showing that likelihood of success on the merits, *and* that the balancing of hardships tips *sharply* in plaintiff's favor. *Cottrell*, 632 F.3d at

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

1135.  *See also, Atlantic Coast Demolition v. Bd. of Chosen Freeholders of Atlantic City,* 893

F.Supp. 301, 309 (D.N.J. 1995) (cited by plaintiff, where the court explains that even where a

movant cites a constitutional violation, a court must carefully weigh the likelihood of success

and the degree of harm to the movant, against the opposing harm and the public interest; and

where a dormant Commerce Clause claim is unaccompanied by a showing of irreparable harm,

the serious question of a constitutional claim does not weigh heavily in the moving party's side).

II.     THE RULE CONFORMS TO LEGISLATIVE AND CASE HISTORY THAT
        DICTATE THE ACT'S PROTECTIONS EXTEND BEYOND WATERS THAT ARE
        NAVIGABLE IN FACT.

      A.      <u>The Act's Purpose Is To Restore And Protect The Water Resources Of The
        United States.</u>

After decades of state failures in protecting and cleaning up the nation's waters, Congress

passed the Federal Water Pollution Control Act, commonly known as the Clean Water Act, with

the stated objective to "restore and maintain the chemical, physical, and biological integrity of

the Nation's waters." 33 U.S.C. § 1251.  *See also, Envtl. Pro. Agency v. California*, 426 U.S.

200, 202-09 (1976); *American Paper Inst., Inc. v. Envtl. Pro. Agency,* 890 F.2d 869, 870-71 (7th

Cir. 1989); *Montgomery Envtl. Coal.*, 646 F.2d at 574; and H.R. 11,896, 92nd Cong. (1971) and

S. 2770, 92nd Cong. (1971) (the bills were written to expand federal authority and control over

waters in order to control and eliminate pollution across the country).  Congress' discussion

centered in part on ensuring that the term navigable waters would not be defined or construed

narrowly, as doing so would defeat the intent of the Act.  H.R. Rep. No. 92-911 at 76–77 (1972)

and S. Rep. No. 92-414 at 77 (1971).  *See also*, 118 Cong. Rec. 33,756–57 (Oct. 4, 1972).

Congress recognized that to achieve its ambitious goal of restoring and protecting our

Nation's waters, it would be necessary to "control pollution at the source."  S. Rep. No. 92-414

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

at 77 (1971).  Therefore, the Act applied not just to navigable-in-fact waters, but to the "waters

of the United States," with Congress recognizing that waters are hydrologically connected,

necessitating broad application in order to ensure that the Nation's waters were clean and safe.

S. Rep. No. 92-414 at 77 (1971) and H.R. Rep. No. 92-911 at 76-77 (1972). [3]  Even the

narrowest provisions in Justice Scalia's opinion in *Rapanos* recognizes that in passing the Act,

Congress intended to cover a much broader set of waters than had earlier been the case or than

was traditionally considered "navigable."  *Rapanos v. United States*, 547 U.S. 715, 731 (2006).

B.      Courts Have Consistently Supported Broad Application Of The Act.

For decades, courts broadly applied the Act to protect "the Nation's waters" which

included many types of waters.  Before and after the decision in *Rapanos,* courts found that

Congress intended to "occupy the field" of protecting waters, that the Act was intended to wholly

supplant the law that came before, that Congress intended to regulate the discharge of pollutants

into non-navigable tributaries and adjacent wetlands because anything less leaves even

traditionally navigable waters unprotected, and that Congress "knew exactly what it was doing"

when it defined "navigable waters" broadly to mean the "waters of the United States." *United*

*States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1321,1324, 1325 (6th Cir. 1974) (quoting

33 U.S.C. § 1362(7)).  *See also, e.g., City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304,

317-19 (1981); *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 22

---

[3] A reminder that Congress intended the definition of "navigable waters of the United States" to
mean waters more broadly than those considered traditionally navigable can be found in the
Act's provisions directing states to adopt and implement water quality standards to protect water
uses "taking into consideration their use and value for public water supplies, propagation of fish
and wildlife, recreational purposes, and agricultural, industrial and other purposes, and also
taking into consideration their use and value for navigation."  33 U.S.C. § 1313(c).  Navigation
was only one of Congress' considerations in protecting water quality.

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION     5

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

(1981) (existing statutory scheme of state control and incentives completely revised by Act); *U.S. v. Hubenka*, 438 F.3d 1026, 1030-1032 (10th Cir. 2006); *U.S. v. HVI Cat Canyon, Inc.*, 213 F.Supp.3d 1249, 1268 (C.D. Ca. 2016) (citing *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 754-55 (9th Cir. 1978)) (wherein the Circuit Court held that "navigable waters" must be given the broadest possible constitutional interpretation). *See, infra* at 14-15 for discussion of post-*Rapanos* case law.

The Supreme Court recognized the Act's broad scope when it upheld the Act's application to adjacent wetlands, observing that the Act incorporates a "broad, systemic view of the goal of maintaining and improving water quality." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985). The Court also noted Congress's determination that "[p]rotection of aquatic ecosystems. . . demanded broad federal authority to control pollution, for '[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'" *Id.* at 132-33 (quoting S. Rep. No. 92-414, p. 77 (1971)).

C.  Recent Supreme Court Decisions Led The Federal Agencies To Develop A Rule To Ensure Congress' Protective Vision Was Realized Within The Direction Of The Court.

Two cases created some confusion over the scope of the Act's coverage. In *Solid Waste Agency of Northern Cook County* ("*SWANCC*") *v. United States Army Corps of Engineers*, 531 U.S. 159, 162, 164 (2001), the Court ruled that the Agencies' "Migratory Bird Rule," could not be used to extend the reach of the Act to "an abandoned sand and gravel pit." Then, in *Rapanos v. United States*, 547 U.S. 715, 729 (2006), the Court remanded, for further review, the Corps' application of the Act to four wetlands "lying near ditches or man-made drains that eventually empty into traditional navigable waters." *Rapanos* produced splintered opinions, with no majority: a four-Justice plurality authored by Justice Scalia, proposed one test for determining

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

whether a water body is a "water of the United States"; Justice Kennedy, concurring in the judgment, proposed another, commonly referred to as the "significant nexus" test; and four dissenting Justices would have left the Agencies' definition in place, but also said they would uphold protection for waters satisfying *either* the plurality's or Justice Kennedy's test. *Id.* at 810 (Stevens, J., dissenting). While neither *SWANCC* nor *Rapanos* invalidated any specific regulatory provision, the decisions left the Agencies with having to decipher whether there was a controlling outcome and if so, what the outcome dictated. *See also,* discussion of *Marks* doctrine, n. 7 *infra.*

Both *SWANCC* and Justice Kennedy's opinion in *Rapanos* emphasized that for a nonnavigable water or wetland to be covered by the Act, it must have a "close" or "potentially. . . close" connection to a navigable water; a "significant nexus." *Id.* at 759. Following *Rapanos*, the Circuits all either adopted Justice Kennedy's significant nexus test, or found that a waterbody that met *either* the significant nexus test or Justice Scalia's test, should be protected under the Act. *See,* citations at 14-15, *infra.*

The task then, of the Environmental Protection Agency and the Army Corps of Engineers (the "Agencies") in devising the Rule, was to determine and demonstrate which waters significantly influence traditionally navigable waters. [4] They did so with an unprecedented review of the scientific literature, with additional advice and comment of experts on topics from biology to hydrology to geology to oceanography to soil science, describing the many vital connections between tributaries, wetlands, and downstream waters. The report, "Connectivity of

---

[4] On June 29, 2018, the Agencies publicly stated their intent to withdraw the Rule and the Agencies published and took public comment on a proposed replacement for the Rule in the spring of 2019. 84 Fed. Reg. 4154 (Feb. 14, 2019).

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION                    7

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (hereinafter the "Science Report") EPA-HQ-OW-0880-20858, found extensive evidence that tributaries and wetlands play critical roles in maintaining the physical, chemical, and biological integrity of downstream waters.[5] The Agencies based the Rule on this evidence.

D. The Rule Protects Waters That Are Scientifically Demonstrated To Have A Significant Impact On Navigable Waters.

The Agencies began the rulemaking process at issue here, by producing and vetting—with input and advice from the Science Advisory Board ("SAB") and various individual expert panelists—the Science Report, a state-of-the-art review and synthesis of the extensive scientific literature describing the numerous important connections between tributaries, adjacent waters, wetlands, and downstream waters. The Science Report synthesized the published, peer-reviewed scientific literature (*see, e.g.,* Chapter 7 of Report) discussing the physical, chemical, and/or biological connectivity between various kinds of streams, wetlands, and other waters, and downstream water bodies. The final Science Report provides the scientific foundation for much of the Final Rule. 80 Fed. Reg. at 37,057, 37,065.

The Science Report found unequivocal, consensus evidence that *all* tributaries, including perennial, intermittent, and ephemeral streams, "exert a strong influence on the integrity of downstream waters," Report at ES-2, and that all tributaries have a significant nexus to traditional navigable waters, interstate waters, and the territorial seas (collectively, "foundational waters"). Thus, the Agencies restored the Act's categorical coverage of tributaries, as defined in the Rule. 33 C.F.R. § 328.3(a)(5). The Science Report also found clear evidence that wetlands

[5] The Science Report is part of the administrative record. Riverkeeper attaches a copy of the Science Report for the Court's convenience. Citations will be to "Report" at specific pages.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

and open waters in floodplains are "highly connected" to tributaries and rivers "through surface water, shallow groundwater, and biological connectivity." Report at ES-2, and 4-1 et seq., especially 4-39. Relying on these findings, the Agencies concluded that all waters adjacent to foundational waters, impoundments, and tributaries have a significant nexus to foundational waters. 33 C.F.R. § 328.3(a)(6). Finally, the Science Report found that wetlands and open waters located outside of floodplains also provide numerous functions, such as storage of floodwater, that benefit downstream water integrity, Report at ES-3, 4020, and 4038, such that certain defined non-adjacent waters can be subject to determination on a case-by-case basis to have a significant nexus to foundational waters. 33 C.F.R. § 328.3(a)(7)-(8). The SAB largely endorsed and supported the analysis and conclusions in the Science Report underlying the Rule. Available at Regulations.gov, EPA-HQ-OW-2011-0880-7531.

The Rule divides waters into three groups: (1) waters categorically protected, (2) waters protected upon a case-by-case showing of a significant nexus, and (3) waters excluded from protection. There are six types of waters that receive automatic protection under the Rule. The first three are traditional navigable waters, interstate waters, and the territorial seas. 33 C.F.R. 328.3(a)(1)-(3).[6] This brief refers to these categories as "foundational waters." The Rule also categorically protects tributaries and waters adjacent to foundational waters. *Id*. § 328.3(a)(4)-(6).

Waters in two categories qualify for protection if a case-by-case analysis shows they have a "significant nexus" to foundational waters. One category is waters that, echoing Justice

---

[6] The Rule makes these same changes to several sections of the Code of Federal Regulations but for ease of reference, this brief will refer to the changes as codified in 33 U.S.C. part 328.

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          9

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Kennedy, <u>are shown to individually or in combination with "similarly situated" waters in a watershed that drains to a foundational water</u>, significantly affect the chemical, physical or biological integrity of the downstream waters. *Id*. § 328.3(c)(5) (emphasis added). The other category has a physical limitation—waters that can be assessed case-by-case for significant nexus, but *only* if they are located within the 100-year floodplain of a foundational water or are within 4,000 feet of a foundational water, impoundment, or tributary. *Id*. § 328.3(a)(8). The Rule excludes from case-by-case determinations waters beyond those boundaries. *Id*.

III. PLAINTIFF HAS NOT DEMONSTRATED AND CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE RULE COMPLIES WITH THE ACT BY PROTECTING WATERS WITH A SIGNIFICANT NEXUS TO DOWNSTREAM WATERS.

A. <u>To Succeed On The Merits Plaintiff Must Demonstrate That The Rule Is Contrary To Law, Arbitrary And Capricious, Or An Abuse Of Discretion.</u>

The Court's review of the Rule is guided, first, by the principles set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). The Court must examine the Rule against the Act, and "[i]f the intent of Congress is clear, 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Chevron*, 467 U.S. at 842-43. A court will invalidate an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C); or "without observance of procedure required by law," *id*. § 706(2)(D). A rule is arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that is counter to the evidence, or is so implausible that it could not be ascribed to a difference in view or agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court engages in a "probing," "substantial inquiry," with the agency action entitled to a presumption of regularity. *Citizens to Preserve Overton Park*, *Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

B. The Rule's Reliance On The Significant-Nexus Test Comports With Supreme Court Case Law.

The Supreme Court held the Act provids federal authority to regulate discharges into both traditional navigable waters and wetlands adjacent to such waters. *United States v. Riverside Bayview Homes*, 474 U.S. 121, 131, 135 (1985). The Court explained that in light of the "breadth of federal regulatory authority contemplated by the Act," and the difficulty of line-drawing in this context, the agency's ecological judgment that wetlands have significant impacts on water quality and the aquatic ecosystem in adjacent waterways is sufficient to deem such wetlands covered by the Act. *See id*. at 134. As long as the covered wetlands have such effects in *the majority of* cases, all such wetlands may be covered. *Id*. at 135 n.9.

The Court reiterated the importance of a waterway's impacts on traditional navigable waters when examining the Act's scope in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159 (2001). There, the Court distinguished the wetlands at issue in *Riverside Bayview* from the sand and gravel pit in *SWANCC* because the gravel pit lacked the "significant nexus" the *Riverside Bayview* wetlands had with other waters of the United States. *See id*. at 167. The Court, however, did not invalidate any portion of the federal regulations—it held only that the regulations, "as clarified and applied to petitioner's balefill site" under the Migratory Bird Rule, exceeded the Corps' authority. *Id*. at 174.

In *Rapanos*, the Court remanded for further review the Corps' determination that certain wetlands adjacent to non-navigable waters, were "waters of the United States." *Id*. at 729, 757,

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION

11

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

759.  A four-Justice plurality devised one test to apply on remand in identifying "waters of the United States," while again recognizing that the Act applies more broadly than to just "traditionally navigable" waters, *id*. at 757 (plurality opinion); Justice Kennedy employed a "significant nexus" test, *id*. at 759 (Kennedy, J., concurring in the judgment); and four dissenting Justices would have deferred to the Corps' regulations as the proper test. *Id*. at 810 (Stevens, J., dissenting), but also adopted and joined Justice Kennedy in holding that, at a minimum, waters in significant nexus to foundational waters are protected under the Act.[7]

The Rule employs the test articulated by Justice Kennedy in *Rapanos*, which itself drew on *Riverside Bayview* and *SWANCC*.  Justice Kennedy concluded that the Act protects waters with a "significant nexus" to waters traditionally considered navigable.  *Id*. at 759, 787.  Such nexus exists where the water, including wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id*. at 780.  Justice Kennedy

---

[7] *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990 (1977) provides guidance for how to read and apply the fractured *Rapanos* result. In *Marks,* a majority agreed on the outcome of the case, but not on the grounds for the outcome.  The *Marks* doctrine dictates that the holding of the Court must be viewed as the narrowest position taken on the result of the case by concurring members of the Court.  *Id.* This works well in a situation where a subset of justices' reasoning fits within a broader decision of other concurring members; the narrower subset should control. In *Rapanos*, however, there is no subset of reasoning fitting neatly within another, but rather a set of overlapping opinions, which concurred only in the result that the matter must be remanded for further examination of jurisdiction with an eye to narrowing the test that the Corps had used previously.  Either Justice Kennedy's or Scalia's approach would narrow the test the Corps had been using, meaning that to have the least far-reaching or least extreme result on then-existing jurisdiction, future courts find jurisdiction where either test is met or where Justice Kennedy's test is met. Under no application of *Marks* can Justice Scalia's test be considered the narrowest grounds on which the Court ruled in *Rapanos*. Justice Scalia's test was the most extreme, not the narrowest, change and curtailment of jurisdiction under the Act.  The *Marks* doctrine stands for the principle that fractured decisions of the Court should not be read to have the furthest reaching or most extreme change in the law or result.  Yet that is plaintiff's argument here.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

explained that the Corps was free, by regulation, to "identify categories of tributaries that, due to their volume of flow. . . their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters." *Id*. at 780-81. Justice Kennedy acknowledged that isolated wetlands may be protected by the Act, singly or in combination with similarly situated wetlands, as they may significantly affect other covered waters "more readily understood as navigable", and that the Corps may properly determine that proximity, volume of flow (annually or on average), or other relevant considerations form the foundation for protecting a wetland under the Act. *Id*. at 780. This is the approach in the Rule.

Justice Kennedy also pointed out that ephemeral waterways, which may be dry much of the time, as well as wetlands without a surface connection to tributaries, can still meet the significant nexus standard.[8] He described the plurality's attempt to impose a continuous flow requirement as making little sense, because "torrents thundering at irregular intervals through otherwise dry channels," which could significantly affect downstream waterways, would then not be covered by the protections in the Act. *Id*. at 769; *see* fig.2 below. Similarly, Justice Kennedy noted that wetlands separated by land from another waterway can be vital to that waterway: if such a wetland is destroyed, "floodwater, impurities, or runoff that would have been stored or contained in the wetlands" could instead "flow out to major waterways." *Id*. at 775. Justice Kennedy rightly sought to give effect to Congress' intent to have the actual science, particularly of hydrology, determine application of the Act.

---

[8] Mr. Martin describes an intermittent water on his Baker property, Martin Decl. at ¶ 5, waters that flow for most of the year, going dry seasonally.

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          13

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Justice Kennedy made clear that waters could be shown to have a significant nexus on a categorical basis, and all water bodies within those categories could be protected, even if specific individual waters in the class did not influence downstream water quality. *Id.* at 780-81.

> The Corps may choose to identify categories of tributaries that, due to their volume of flow (either annually or on average), their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, *in the majority of cases*, to perform important functions for an aquatic system incorporating navigable waters.

*Id.* (emphasis added). This categorical approach follows that of the unanimous Court in

*Riverside Bayview*, which noted:

> If it is reasonable for the Corps to conclude that *in the majority of cases*, adjacent wetlands have significant effects on water quality and the aquatic ecosystem, its definition can stand. That the definition may include some wetlands that are not significantly intertwined with the ecosystem of adjacent waterways is of little moment, for where it appears that a wetland covered by the Corps' definition is in fact lacking in importance to the aquatic environment—or where its importance is outweighed by other values—the Corps may always allow development of the wetland for other uses simply by issuing a permit.

474 U.S. at 135 n.9 (emphasis added).

All of the Circuit Courts, including the Ninth, that have addressed this issue following

*Rapanos* have applied Justice Kennedy's significant nexus analysis or have adopted the even broader application of the Act's protections where a water meets either Justice Kennedy's or Justice Scalia's test. *See, United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009) and *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006) (if either plurality or Justice Kennedy's test is met, there is a "water of the United States"); *United States v. Gerke*, 464 F.3d 723, 724 (7th Cir. 2006) (Court looks to "significant nexus" standard as precedent); *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007) (same); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007) (same) (followed by *N. Cal. River Watch v. Wilcox,* 633 F.3d 766, 781 (9th Cir. 2011) where court describes Justice Kennedy's concurrence as the "controlling rule

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

of law"); *United States v. Lucas,* 516 F.3d 316, 327 (5th Cir. 2008) (same); *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) (same). *See also, Precon Dev. Corp., Inc. v. United States Army Corps of Engineers,* 633 F.3d 278, 289-90 (4th Cir. 2011) (parties agree and court adopts Justice Kennedy significant nexus test, approving of Corps definition of "adjacent") and *Upstate Forever v. Kinder Morgan Energy Partners, L.P.,* 887 F.3d 637, 649 n.10 (4th Cir. 2018) (characterizing Justice Kennedy's *Rapanos* concurrence as "controlling"). Plaintiff's citation to and reliance on the plurality opinion should be rejected as inconsistent with this Circuit's controlling precedent, inconsistent with precedent throughout the circuit courts of appeal, and inconsistent with proper application of the *Marks* doctrine.

C.      The Scientific Record For The Rule Overwhelmingly Confirms That Tributaries And Adjacent Waters Significantly Influence Downstream Waters.

1.      *Tributaries*

Tributaries to foundational waters are categorically waters of the U.S. under the Rule, entitled to protections under the Act. Tributaries are defined as a water that contributes flow, either directly or through another water to a foundational water, and a tributary is characterized by the presence of physical indicators of a bed and banks and an ordinary high water mark. 33 C.F.R. § 328.3(c)(3). The Rule further explains that these physical indicators demonstrate that there is a volume, frequency, and duration of flow sufficient to be considered a tributary.

The Science Report demonstrates tributaries and adjacent waters play fundamental roles in determining the course a river takes and its physical, biological and chemical composition. Tributaries supply flow (from snowmelt or channeling precipitation, or from springs or upwellings) as well as materials that form the river's bed and banks, such as sediment, and the materials that fill it, such as nutrients and organisms. *See, e.g.*, Report at 3-47 tbl.3-1, 4-40 tbl.4-

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          15

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

3.  In some cases, tributaries filter or settle out, or delay the delivery of, materials like contaminants or floodwaters. *Id*. at 3-47 tbl.3-1, 4-40 tbl.4-3.  Tributaries also serve as nurseries or spawning areas for species that migrate downstream later in their life stages, for example, as part of migrating salmon lifecycles.  *See, e.g., id*., at ES-5 and 13, 1-9, 2-40, and 2-44.

To understand the significance of connections between tributaries and downstream waters, or between adjacent waters and downstream waters, one must consider the combined effect across the watershed and over time.  *Id*. at 6-10.  By analogy, a study of how local traffic contributed to arterial highway traffic, would not rely on a snapshot of a single local road in the middle of the afternoon or night.  If it did, it might conclude, incorrectly, that local roads were not contributing any traffic to the highway.  Instead, a researcher would collect data from roads and interchanges throughout the area, at low-traffic and high-traffic times, and look at all the data together to understand the impact of local traffic on the regional highway.

Just as a highway has many inputs, so does a river—each tributary contributes water, sediment, chemicals, and organic material, as well as providing connected habitat for aquatic species, and together these inputs and functions constitute the river.  Just as traffic on a highway fluctuates at different times of the day and week, river networks expand and contract as the seasons change in response to precipitation.  The illustration below shows the same river during wet and dry periods.  Looking only at the connections between the river and its visibly adjacent wetlands during the dry period, one might underestimate the significance of those connections. The effects of tributaries and adjacent waters on downstream waters are cumulative, and the connections between those waters must be analyzed together over time. Report at 6-10.

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          16

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*



**Fig. 1:** A river system during wet and dry periods. Source: Science Report 1-7 fig.1-2 (including key).

One reason tributaries are important to downstream waters is that tributaries help determine the character of the water downstream—physically, chemically, and biologically. *Id*. at 3-45 to 3-46. Tributaries cover a broader expanse than rivers, collecting water and other materials, delivering it toward a concentrated point downstream. *Id*. at 3-5. In the arid and semiarid West, where a majority of tributaries are seasonally dry, *id*. at 2-29, flows from ephemeral tributaries (without visible surface water at all times), are still major drivers of flows in downstream rivers. *Id.* at B-59. For instance, when a storm in New Mexico dropped up to

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

one-quarter of the area's annual rainfall in two days, flood flows from the Rio Puerco, an

ephemeral tributary to the Rio Grande River, accounted for 76% of the flood flow in the river, *Id*.

at 3-7 to 3-8; Vivoni 2006; *see* fig.2, physically affecting downstream waters, replenishing

nutrients and building aquatic habitat.





**Fig. 2:** Floodwaters swelling and receding in the Rio Puerco, an ephemeral tributary. Source: Vivoni 2006.

Even when water in ephemeral tributaries sinks into the ground before reaching downstream

rivers, it plays a critical role in replenishing shallow groundwater flows.  Anyone familiar with

water in arid landscapes understands, not least ranchers and farmers dependent upon irrigation,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

these groundwater flows are a vital source of surface water for the downstream rivers when they resurface through springs or base flow. *Id*. at B-59, 5-8 (e.g. ephemeral tributaries supply roughly half of the San Pedro River's "baseflow," the portion of the river fed by groundwater), B-39. Shallow groundwater is a vital connection between waterbodies and serves important physical and biological functions for rivers. *See, e.g., id*. at ES-2 to 3, ES-8 to 9, 2-11 (incl. Fig. 2-5), 2-34, 4-11, 4-14, 4-22 to 23 and 28, 5-2.

Tributaries also have a major influence on the chemical composition of downstream waters, *Id*. at 3-46, 6-1 to 6-2, by supplying a large proportion of the water in rivers, and by carrying chemicals—both good and bad. *Id*. at 3-22. For example, organic material, important for biological productivity can accumulate in ephemeral channels during dry periods and is carried downstream in great quantities when those channels fill with floodwater. *See id*. at 3-29, B-48 (in the San Pedro River, dissolved organic carbon doubled or tripled during storm events from a flush of terrestrial organic matter and nutrients). Tributaries can also affect the chemical makeup of downstream waters by contributing, removing, transforming, or delaying the delivery of harmful chemicals discharged upstream. *Id*. at 3-47 tbl.3-1.

Finally, tributaries are essential to living organisms downstream. *Id*. at 3-46. Headwaters provide crucial habitat for many aquatic species, including plants, insects, crustaceans, and fish. *Id*. at 3-38, 6-3. Native fish are adapted to the variable flows that ephemeral tributaries provide, and these adaptations allow them to outcompete invasive species. *Id*. at B-38, B-58. Many western rivers are fed significantly by snowmelt from tributaries high in the watershed and the large snowmelt-fed flows in rivers like the Columbia and Snake provide the means for salmon to travel to and from spawning areas to the ocean. *Id*. at 3-46.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Adjacent waters are "bordering, contiguous, or neighboring" foundational waters, impoundments, or tributaries. 33 C.F.R. § 328.3(a)(6) & (c)(1). "Neighboring" waters are very close to a foundational water, impoundment, or tributary (within 100 feet, *id.* § 328.3(c)(2)(i), or within 1,500 feet of tidally influenced waters or the Great Lakes, *id.* § 328.3(c)(2)(iii)), or within the 100-year floodplain, out to a distance of 1,500 feet, *id.* § 328.3(c)(2)(ii). Smaller tributaries have smaller floodplains than large rivers, Science Report at 4-6, and some tributaries have little or no floodplain, *id.* at 2-5, 2-6; *see* fig.3. For some tributaries the area in which waters are "adjacent" will be limited to a shorter distance than 1,500 feet, because the 100-year floodplain will not extend that far. For rivers with large floodplains, the 100-year floodplain will extend well beyond 1,500 feet, but only waters within 1,500 feet will be "adjacent."

**A. Headwater Stream with Riparian Area and Minimal or No Floodplain**



**B. River with Riparian Area and Floodplain**



**Fig. 3:** A tributary with minimal or no floodplain, and a river with a larger floodplain. Source: Science Report at 2-6 fig.2-3.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

The Science Report found clear evidence that wetlands in floodplains are "highly connected" to rivers and tributaries. *Id*. at 4-39. The physical connections between rivers and floodplain wetlands are extensive, occurring even when the river is not in flood stage. *Id*. Floods, even if infrequent, have significant, lasting, and beneficial impacts because they allow rivers and wetlands to exchange water and other materials. *Id*. at 4-1, 4-39. For example, sediment released from wetlands during a flood can shape a river's channel and affect its physical integrity. *Id*. at 4-39. Floodplain wetlands reduce floods by storing water that overflows from rivers or that may flow from the landscape into a river (thereby helping to control and slow flooding downstream). *Id*. at 4-1, 6-4.

Even when there is no surface-water connection between a river and a neighboring wetland, shallow groundwater flows may provide a connection. *Id*. at 4-39. Tributaries and rivers are not "pipes" that simply carry water from one place to another in discrete containers. *Id*. at 2-21. They are porous, and water from a river's channel regularly enters the shallow subsurface, where it may mix with other subsurface water (including water from neighboring wetlands) before returning to the channel or even to other surface waters. *Id*. at 2-12, 4-7. These shallow subsurface flows can connect rivers to floodplain wetlands during both high-flow and low-flow periods. *Id*. at 2-12, 4-7; *see* fig.4.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*



**Fig. 4:** Illustration of subsurface exchanges of water between a river and its floodplain wetlands (i.e., wetlands in the light blue band bordering the river). Source: Science Report at 1-5 fig.1-1A.

or capture chemicals. *Id*. at 4-11. One of the most important functions of floodplain wetlands is to intercept contaminants, such as excess fertilizer and pesticides from agricultural operations, by filtering them through the roots of wetland plants. The plants absorb the contaminants and prevent them from reaching the river. *Id*. at 4-11, 4-14.

The Science Report found compelling evidence of strong and extensive connections between tributaries and downstream waters, and between floodplain wetlands and downstream waters. *Id*. at 6-1 to 6-5. The Agencies therefore reasonably concluded that tributaries and adjacent waters have a significant nexus to foundational waters, and are categorically entitled to the protections of the Act pursuant to the Supreme Court's significant nexus test.

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION     22

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

D.    <u>Plaintiff's Implications That Tributaries And Adjacent Waters Are Not Properly Protected Under The Act Are Contrary To Law And Science.</u>

1.    *Tributaries*

The Rule requires an ordinary high water mark *and* a bed and banks *and* the contribution of flow to a downstream water.  The Rule plainly requires all *three* indicators, *combined*, to define a tributary—all physical manifestations of a tributary under the Rule.  33 C.F.R. § 328.3(c)(3).  Further, these indicators are fully supported by the Science Report and endorsed by the SAB and the Agencies specifically stated that they included the additional requirement of a bed and banks to help ensure that flow would be sufficient to create a significant nexus.  Report at 3-45 and 5-6 and SAB letter and reviewer comments at Regulations.gov EPA-HQ-OW-2011-0880-7531 and -7617 respectively.  As shown above, no scientific basis exists for plaintiff's suggestion that infrequently flowing tributaries lack a significant nexus to downstream waters.  Frequent or regular flow is not a prerequisite to a water body exerting a significant influence on downstream waters.  In arid parts of the U.S., infrequent, heavy rains are *the normal precipitation* pattern, and supply much of the water that flows in some rivers.  Ephemeral tributaries are responsible for carrying a substantial amount of precipitation, pollutants and other materials to rivers in arid regions, with the attendant physical, chemical, and biological effects, and thus are just as important as tributaries in wetter areas.  The Science Report recognizes that water bodies can be just as significantly connected if a flow is substantial but infrequent (or subsurface) as if the flow is small but visible and constant.  Report at 1-8, 1-10.  Justice Kennedy recognized this phenomenon in *Rapanos* in noting that the Los Angeles River often carries "only a trickle of water."  *Rapanos*, 547 U.S. at 770.  Tributaries, even when intermittent or

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

ephemeral—and thus do not have constant flow—contribute significantly, individually and cumulatively, to the health and composition of downstream waters.

## 2. Adjacent waters

Plaintiff also implies that adjacent waters should not be protected under the Act, but the overall approach in the Rule is plainly consistent with existing Supreme Court case law and amply supported by the record. First, the Rule's definition of "adjacent" is fully consistent with the Supreme Court cases. In *Riverside Bayview*, the Court deferred to the Corps' conclusion that wetlands "in reasonable proximity to other waters of the United States" were "inseparably bound up with" those neighboring waters from an ecological perspective, including via subsurface and biological connections. *Riverside Bayview*, 477 U.S. at 134. *SWANCC* dealt with undisputedly nonadjacent waters, and thus had nothing to say about the meaning of "adjacent."

In *Rapanos*, Justice Kennedy not only accepted the Corps' definition of "adjacent" as "reasonable," *Id.* at 775, but further affirmed that the Corps was free, by regulation, to "identify categories of tributaries that, due to their volume of flow . . . their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters." *Id.* at 780-81. Justice Kennedy further acknowledged that isolated wetlands may well be protected by the Act, singly or in combination with similarly situated wetlands, as they can significantly affect other covered waters "more readily understood as navigable," and that the Corps may properly determine that proximity, volume of flow (annually or on average), or other relevant considerations may form the foundation for protecting a wetland under the Act. *Id.* at 780. Plaintiff's claims regarding adjacent waters find no support in the law or the science.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

IV.   PLAINTIFF DOES NOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON ITS
      CONSTITUTIONAL CLAIMS NOR EVEN SUPPORT THEM ADEQUATELY TO
      RAISE A SERIOUS QUESTION.

Plaintiff is unlikely to succeed on the merits, and no serious constitutional question exists

in this case, because the Rule meets all constitutional requirements.  Further, plaintiff fails to

carry its burden because plaintiff's motion simply raises the potential of a constitutional claim

but does not describe or support the claim with specific facts or arguments supported by the law.

A.   There Is No Commerce Clause Or Tenth Amendment Violation Because The
     Rule Covers Waters That Have A Significant Nexus To Navigable Waters.

The Constitution grants Congress authority to regulate interstate commerce. U.S. Const.,

art. I, § 8.  The Act's regulation of navigable and interstate waters, and their tributaries and

adjacent waters, as described in the Rule, falls comfortably within this authority.

Congress's Commerce Clause authority unquestionably extends to the regulation of

waters that are themselves navigable—by definition, channels of commerce.  *See Nat'l Fed'n of

Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (Congress may regulate "the channels of

interstate commerce"); *PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012) (waters are

"navigable in fact" when they are or may be used "as highways for commerce"); *see also Utah v.

United States*, 403 U.S. 9, 10-11 (1971) (waters may be "highways for commerce" even if not

interstate); *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1325 (6th Cir. 1974)

(Water pollution is "a direct threat to navigation").  As set forth above, the Supreme Court has

also long accepted federal authority over interstate waters, without regard to navigability.  *See,

e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 (1972) ("Rights in interstate streams, like

questions of boundaries, 'have been recognized as presenting federal questions.'"); *id.* at 105 n.6

(noting that application of federal law was important because Lake Michigan was "bounded . . . by four States" without mentioning navigability).

By extension, the regulation of waters that significantly affect navigable and interstate waters is also within the authority granted to Congress to regulate channels of commerce. *See Rapanos v. United States*, 547 U.S. 715, 776 (2006) (Kennedy, J., concurring) (explaining that in *SWANCC*, the requirement of a "significant nexus" to navigable waters avoided constitutional difficulties and federalism concerns); *id*. at 782-83 (citing Supreme Court case law explaining, *inter alia*, that regulation of tributaries may be required in order to manage a navigable water); *Ashland Oil*, 504 F.2d at 1326 (Congress may regulate non-navigable stretches of a river to preserve commerce on the navigable portions); *id*. at 1326-28 (federal authority to preserve navigable waters must extend to tributaries of such rivers, lest they become "a mere conduit for upstream waste"). The Rule covers waters that have a significant impact on the channels of commerce. *See, e.g.*, Final Rule, 80 Fed. Reg. at 37,079 (explaining, for example, that ephemeral headwater streams "shape river channels in traditional navigable or interstate waters" by accumulating and releasing materials like sediment and debris). The Rule falls squarely within Congress's power to regulate the channels of commerce.

The plaintiff does not dispute these core principles and offers little to no argument on the merits of its Commerce Clause or Tenth Amendment claims, stating only that by alleging a Constitutional claim, they are presumed entitled to an injunction. That is not the law. *Assoc. Gen'l Contractors of Cal., Inc.*, 950 F.2d at 1410. Again, even if plaintiff reasonably sets forth a constitutional claim, that claim must be supported by facts and law and it does not relieve the plaintiff of making a vigorous showing of irreparable harm tied to that constitutional claim.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Plaintiff's largely unsupported Tenth Amendment claim appears also premised on a contention that the Rule covers waters lacking the requisite significant nexus. That claim fails, again because the Rule plainly supports the significant nexus of the waters it covers. Moreover, the Tenth Amendment gives way to valid exercise of the Commerce Clause—only those rights not reserved to the federal government, that fall to the states. Finally, a water protected by the Act can *also* be regulated by states and subject to even more stringent protections; it does not "displac[e]" state authority. The Act's protections are a floor; a minimum standard of protection and cleanliness below which Congress determined, as a nation, we should not allow our most precious resources to fall. *See* 33 U.S.C. § 1370; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 499 (1987) (the Act "specifically allows" states to impose stricter standards on pollution sources within their borders).

The Rule is within the scope and purpose of the Clean Water Act and the Constitution as interpreted and directed by the Supreme Court and is fully supported by the record. The Rule does not infringe on the purview of the States.

B.      There Is No Due Process Violation Because The Rule Is Not Vague.

Plaintiff's claims that the Rule is unconstitutionally vague hinge on the argument that the Rule creates uncertainty about whether particular water bodies will be deemed waters of the United States. In fact, the Rule promotes clarity and certainty in a number of ways.

The Constitution does not demand "perfect clarity" or "precise guidance." *United States v. Williams*, 553 U.S. 285, 304 (2008). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id*. at 306. The test is

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

ultimately whether a person of common intelligence has a reasonable opportunity to know what is prohibited and need not guess. *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).[9]

The Rule is not vague. It provides increased direction to states, businesses, and the public. It outlines exactly what markers the Agencies will examine to determine whether a waterbody is subject to the protections of the Act. It describes how those markers are grounded in consensus science and provides the public a technical support document and Science Report for additional detail. For example, the tributary definition is more than sufficient to alert a landowner to the possibility that a stream, ditch, or other sometimes-wet channel on his property may be a tributary. The words "bed and banks" are commonly understood terms, and the phrase "ordinary high water mark" is defined by reference to plain terms such as "clear, natural line impressed on the bank," "vegetation," and "litter and debris." 33 C.F.R. § 328.3(c)(3). Likewise, the tributary definition provides more than "minimal guidelines" to govern agency staff. *Kolender*, 461 U.S. at 358. While the Rule may not have delineated and categorized each of the Nation's water bodies with mathematical precision, that is not what the law requires. The Rule satisfies due process because it puts the regulated public on reasonable notice that certain types of water bodies, based on scientifically supported, objective, and knowable measures present on the landscape, may be covered by the Act. *See also, United States v. Lucas*, 516 F.3d 316, 328

---

[9] Vagueness challenges should only be entertained if the rule is *vague in all of its applications*; if an aspect of a plaintiff's conduct is clearly proscribed, a plaintiff cannot complain of vagueness when applied to the actions of others. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982). "The fact that 'doubts as to the applicability of the language in marginal fact situations may be conceived' does not make an enactment unconstitutionally vague on its face." *Harper v. Crockett*, 868 F.Supp. 1557, 1582 (E.D. Ark. 1994) (quoting *U.S. v. Powell*, 423 U.S. 87, 93 (1975)).

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          28

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

(5th Cir. 2008) (rejecting vagueness challenge to an application of the Act because "the prevalence of wet property . . . and an area network of creeks and their tributaries leading to the Gulf, some of which connected to wetlands on the property, should have alerted 'men of common intelligence' to the *possibility* that the wetlands were waters of the United States" (emphasis added)).

V.     THE FINAL RULE DID NOT RUN AFOUL OF NOTICE AND COMMENT
       REQUIREMENTS.

There is no violation here of the notice and comment requirements of the Administrative Procedure Act ("APA"). The APA requires notice and comment on the terms or substance of the proposed rule or a description of the subjects and issued involved. 5 U.S.C. § 553(b)(3). The notice for a proposed rule need not specify or use the precise language that is ultimately adopted and can even incorporate fairly substantial changes as long as the final rule is a "logical outgrowth" of the proposed rule and where the proposed rule and topics addressed was sufficient to fairly apprise interested parties of the issues and proposals involved and in play. *See, e.g., Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 174 (2007); *Veteran's Justice Grp., LLC v. Sec'y of Veterans Affairs,* 818 F.3d 1336, 1344 (Fed. Cir. 2016). Courts will find that a rule is not a logical outgrowth in instances where a final rule is the opposite, unanticipated result from an agency proposal. *See, Envtl. Integrity Project v. EPA,* 425 F.3d 992, 996 (D.C. Cir. 2005) and *Shell Oil Co. v. EPA*, 950 F.2d 741, 750-51 (D.C. Cir. 1991). The Rule here is a logical outgrowth of the proposed rule.

The proposed rule stated its purpose as identifying waters that will be protected under the Act and for waters not categorically protected, it set forth definitions and processes for how those determinations will be made in the future. It plainly provided information and notice sufficient

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

to fairly apprise the states and other interested parties of the issues and proposals involved and in

play.  In particular, the proposed rule sought comment and input on whether and how the final

rule should address specific bodies of water that in combination with similarly situated lands in

the region, significantly affect the chemical, physical, and biological integrity of other covered

waters. 79 Fed. Reg. 22,188, at 22,192-93, 22,250-51, and 22,261 (April 21, 2014).  The

proposed rule asked for comment on how to cover and define tributaries and on the concept and

definition of "adjacency" and "neighboring."  *Id*.  Finally, the Agencies made a draft of the

Science Report and the Technical Support Document available for review during the comment

period.  79 Fed. Reg. at 22,188.  Nothing in the finalization of these documents deprived the

plaintiff of its chance to understand and comment on the issues and proposals in play.

VI.    PLAINTIFFS HAVE FAILED TO SHOW HARM, MUCH LESS IRREPARABLE
       HARM, FROM THE RULE.

Plaintiff provides two declarations in support of its motion, neither of which supplies

evidence of actual, specific, (or for that matter even general) harms that will occur in the absence

of the requested injunction.  Therefore, in addition to the failure to demonstrate likelihood of

success on the merits, plaintiff has failed to demonstrate any harm, irreparable or otherwise, that

will result from application of the Rule in the State of Oregon.

In the Ninth Circuit, even if a plaintiff has demonstrated the likelihood of success on the

merits, they must also demonstrate that irreparable harm is likely, resulting from application of

the rule or action in question.  *Cottrell*, 632 F.3d 1127 at 1134-5.  Speculative or remote injury

does not constitute harm dictating the extraordinary remedy of injunctive relief.  *Colorado R.*

*Indian Tribes v. Town of Parker*, 776 F.2d 846, 849-50 (9th Cir. 1985).  Rather, the injury must

be actual and imminent and it is the movant's burden to demonstrate.  *Cottrell*, 632 F. 3d at

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          30

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

1135.  Finally, financial injury is generally insufficient to support preliminary injunctive relief. *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984). Here, plaintiff makes only the vaguest of statements regarding possible necessity of permit for polluting waters, "concerns" about the Rule, and that there may be "diminished willingness" to engage in some voluntary conservation activities on some unidentified lands, and that there may be a consideration to change plans in the future.

The Rosa declaration is primarily an organizational declaration, addressing only the plaintiff's interest in, and general dissatisfaction with, the Rule while providing little about actual harm that is expected from the Rule.  Speaking for the plaintiff organization, Mr. Rosa sates that he is "familiar with water features" on "properties around the state," "most" of which "have ephemeral or intermittent features."  Rosa Decl. at ¶ 5.  Mr. Rosa fails to identify any example of such waters anywhere in the state.  Further, there is nothing in being familiar with waters that have these features that suggests Mr. Rosa or his organization's interests will be harmed by application of the Rule in any way, other than the claim that some of plaintiff's members will potentially have to get permits for polluting, destroying or degrading unspecified waters on their properties, a financial "harm" at most.  *Id.*  at ¶ 4.  Again though, Mr. Rosa fails even to give an example of where that financial harm of obtaining a permit might occur.  Mr. Rosa, speaking for the plaintiff organization, states that the organization opposes the Rule, *Id.*  at ¶¶ 7 and 11, (which is plain from its initiation of this suit) and that it has and will spend resources related to engaging speakers to explain application of the Rule and its potential effect on cattle ranching to its members.  *Id.*  at ¶¶ 9-10, and 12.  Mr. Rosa does not supply that explanation of the potential effects on cattle ranching in his declaration though, leaving the court to guess not just what those effects might be, but whether they are actually harmful in any way.  Further, presumably the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

plaintiff would explain the effects of a rule it considered positive to its members as well, education of its members being part of plaintiff's mission. There is nothing inherently negative or harmful in an organization providing an educational service to its members.

The only other declaration plaintiff provides in support of its motion is that of Mr. Martin. Mr. Martin's declaration is also short on details and also fails to demonstrate actual harm from the Rule. Mr. Martin asserts his ownership of property and his status as a cattleman in Baker and Malheur Counties, Oregon. Martin Decl. at ¶¶ 5 and 6. His Baker County property is used for grazing and crops and is claimed to include an unnamed intermittent tributary to the Powder River (itself a tributary to the Snake River). Mr. Martin states that the unnamed tributary located somewhere on his property is "frequently" dry in the summer months (although apparently not dry each year during those months). *Id.* at ¶ 5. Mr. Martin offers nothing more regarding the unnamed tributary or his plans for it. Mr. Martin does not identify any specific action or prohibition on his use of his property as a result of the Rule. He has not been denied a permit or even, apparently, been subjected to a permitting process as a result of the Rule.

On the Malheur County property, Mr. Martin generally identifies, with no specifics as to type or location or quality or size, intermittent springs and streams that occur or flow as the result of seasonal rain. *Id.* at ¶ 6. He also identifies artificial ephemeral ponds that he states are designed to catch and store rain. *Id.* These ponds were and still are excluded under the Rule, so any "concern" about those ponds is unfounded. *See* 40 C.F.R. 230.3(s)(2)(iv)(B). Mr. Martin does not describe any action, prohibition, permitting, threat, or any harm related to any of these waterbodies on his Malheur County property. He does not describe any prohibited activity, any interference with plans, or any denial of permit or even requirement for permit for any identified activity relative to these waters.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Mr. Martin states only that, based on things he has read about statement of the Corps of Engineers in two earlier Clean Water Act enforcement cases, he might be somewhat less willing in the future to engage in generally-described "conservation activities" on his land (most of which appears to be related to upland work.) *Id.* at ¶¶ 8 and 9. But, each of the cases that have caused Mr. Martin concern involve enforcement of the Act *prior* to the Rule in question here; neither case actually concerns the Rule. *See United States v. LaPant*, No. 2:16-CV-01498-KJM-DB, 2019 WL 1978810, at *2 (E.D. Cal. May 3, 2019) (alleging discharges "on or near wetlands that are *contiguous* to [a tributary], which flows into a 'traditional navigable water,'"); *Duarte Nursery, Inc. v. U.S. Army Corps of Engineers*, 17 F. Supp. 3d 1013, 1016 (E.D. Cal. 2014) (alleging unlawful discharges "into" Coyote Creek); *see also* 80 Fed. Reg. at 37,080 (noting that "[t]he existing regulation [prior to development of the Rule] defined 'adjacent' to mean 'bordering, contiguous, or neighboring.'") Neither Mr. Martin nor plaintiff offer evidence that waterways involved in the cited enforcement actions are jurisdictional under the 2015 Rule but non-jurisdictional under the pre-2015 Rule. Mr. Martin provides no details regarding how the specifics of those cases are different or like any activity he engages in or plans to or needs to engage in for his operations on his land.

Mr. Martin's vague concerns and his "diminished willingness" to maybe engage in voluntary conservation measures on his land are not the kind of actual and immediate irreparable injury that support a request for injunctive relief. Plaintiff has failed to make even the most minimal showing of harm, much less actual, immediate, irreparable harm from the Rule.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

VII. THE BALANCE OF HARM TIPS SHARPLY IN FAVOR OF DENYING THE REQUEST FOR INJUNCTIVE RELIEF AND THE PUBLIC INTEREST IS IN PROTECTING PUBLIC WATER RESOURCES.

While plaintiff has failed to make a demonstration of actual and immediate harm, much less irreparable harm, the harm of excluding waterbodies in Oregon from the protections afforded by the Act are real, significant, and potentially permanent. There are two primary protections afforded by the Act to waters of the U.S.

The Act prohibits the discharge of any pollutant to waters of the U.S. by any person, except as specifically authorized by the Act. 33 U.S.C. §1311(a). Point source discharges of pollutants can be authorized through a National Pollutant Discharge Elimination System ("NPDES") permit, administered by either EPA or an authorized state. 33 U.S.C. § 1342. NPDES permits serve to ensure that any discharge is monitored and controlled through applicable limits and technology designed to meet applicable water quality standards. *See generally*, 33 U.S.C. § 1342 and applicable rules at 40 C.F.R. pt. 122. Dredge and fill activities in waters of the U.S. can be authorized through "Section 404" permits administered by the Corps of Engineers with oversight by EPA. 33 U.S.C. § 1344(a). Again, Section 404 permits ensure that dredge and fill activities are monitored, controlled, and mitigated in order to implement "no net loss" of wetland function and values on the landscape. *See e.g. generally*, EPA permitting guidelines at 40 C.F.R. pt. 230.

If the Act does not apply to a body of water or wetland, then the prohibitions on discharge, including the prohibitions on dredge or fill destruction of waters, do not apply, nor do the regulatory structures of the permitting process. Enjoining application of the Rule will likely result in some waters being vulnerable to the discharge of pollutants or to dredging or draining or filling (and their ultimate destruction or significant degradation). In fact, plaintiff's motion and

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          34

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

the Rosa Declaration suggest as much—that the membership will supposedly need permits to do things that pollute, dredge, or fill waters and the members prefer to not get those permits before engaging in polluting or destructive actions that are prohibited under the Act. This will harm not only the immediate waters in question, but, as discussed above and demonstrated in the Science Report, will harm aquatic life and waters downstream of the pollution or destruction. A wetland that is destroyed is irreparably damaged, maybe permanently, but certainly for a lengthy period of time (depending on the type of damage done.)

This is harm to public resources. All citizens of the State of Oregon, indeed all citizens of the Nation, depend on and are entitled to clean and healthy waters for a multitude of uses. The Powder, Snake, and Columbia rivers are resources for irrigation and drinking water; for salmon and commercial, recreational and subsistence fishing; for wildlife and livestock watering; for all the uses that humans put waters to. It is this underlying public resource value that makes the protections in the Clean Water Act so fundamental and important. When weighed against the speculative "harm" identified in the plaintiff's declarations which is primarily financial and private, the scale plainly tips toward a protective approach for the good of the public as a whole.

The Ninth Circuit has directed that the public interest strongly favors preventing, not fostering, environmental harm. *Southeast Alaska Conserv. Council v. U.S. Army Corps of Engineers*, 472 F.3d 1097, 1101 (9th Cir. 2006). Further, courts in the Circuit repeatedly find that protecting against environmental harm, including protecting water from pollution, profoundly outweighs financial interest or harm, even if the public has a stake in the financial interest. *See, Oregon State Public Interest Res. Group v. Pacific Coast Seafoods Col,* 374 F.Supp. 2d 902, 908 (D. Or. 2005); *Idaho Conserv. League v. Atlanta Gold Corp.*, 879 F.Supp. 2d 1148, 1162 (D. Id. 2012). Even if plaintiff's members may have a financial interest in

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          35

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

polluting or destroying waters without permits, that is profoundly outweighed by the potential

harm to those waters and/or to downstream waters should the Court enjoin the Rule.  Plaintiff's

motion should be denied as the public interest in protecting waters outweighs any harms

identified by plaintiff from application of the Rule.

## CONCLUSION

Plaintiff has not demonstrated a likelihood of success on the merits of its claims, has not

demonstrated actual, immediate harm from the Rule, and the balance of harms and public interest

in protecting the nation's water resources outweigh any claimed harm to plaintiff and its

membership.  Columbia Riverkeeper respectfully request that the Court deny plaintiff's Motion

for Preliminary Injunction in its entirety.

Respectfully submitted this 3rd day of July, 2019.

*/s/ Janette K. Brimmer*
JANETTE K. BRIMMER (WSB # 41271)
(*Pro Hac Vice pending*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
(206) 343-7340 (phone)
(206) 343-1526 (fax)
jbrimmer@earthjustice.org


*/s/ Jennifer C. Chavez*
JENNIFER C. CHAVEZ (DCB # 493421)
(*Pro Hac Vice pending*)
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036-2243
(202) 667-4500 | Phone
(202) 667-2356 | Fax
jchavez@earthjustice.org

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          36

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*/s/ James Neville Saul*
JAMES NEVILLE SAUL (OSB #152809)
Earthrise Law Center
Lewis & Clark Law School
10015 S.W. Terwilliger Boulevard
Portland, OR 97219
(503) 768-6929 | Phone
(503) 768-6642 | Fax
jsaul@lclark.edu

*Attorneys for Amicus Curiae Columbia Riverkeeper*

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION

37

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,565 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

*/s/ Janette K. Brimmer*
JANETTE K. BRIMMER (WSB # 41271)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2019, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.


*/s/ Janette K. Brimmer*
JANETTE K. BRIMMER (WSB # 41271)

COLUMBIA RIVERKEEPER'S AMICUS BRIEF
IN OPPOSITION TO PRELIMINARY INJUNCTION          39

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*