CHRISTINA M. MARTIN, OSB #084117
Lead Counsel
PACIFIC LEGAL FOUNDATION
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000
cmartin@pacificlegal.org

ANTHONY L. FRANÇOIS*
Cal. Bar #184100
DANIEL M. ORTNER, Va. Bar #89460*
*(*pro hac vice*)
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
tfrancois@pacificlegal.org
dortner@pacificlegal.org

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| OREGON CATTLEMEN'S ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ET AL.,<br><br>Defendants,<br><br>COLUMBIA RIVERKEEPER,<br><br>Intervenor-Defendant. | No. 3:19-cv-00564-AC<br><br>**PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION**<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

MOTION FOR PRELIMINARY INJUNCTION ........................................................ 1

I.    Introduction .......................................................................................................... 2

II.   Legal Background: Decades of Dubious EPA and Army Regulation
of Non-navigable Features Under the Clean Water Act ........................................ 3

ARGUMENT ............................................................................................................. 9

I.    Cattlemen Has Standing Because the Intermittent Tributary
and Non-abutting Adjacent Wetland Provisions Require Them
to Get the Army's Permission to Work Their Own Land ...................................... 9

II.   The Court Should Preliminarily Enjoin the Intermittent
Tributary and Non-abutting Wetland Provisions ................................................ 10

    A.   Cattlemen Will Prevail on the Merits ......................................................... 11

        1.   The Judgment Against the Government in *Rapanos*
Controls in This Case Under Issue Preclusion ....................................... 11

        2.   The Scope of the Preliminary Injunction Depends on
Which *Rapanos* Opinion Is the Holding ............................................... 13

           a.   The Supreme Court Has Established That the
Plurality Is the Holding of *Rapanos* ........................................... 13

           b.   This Court Must Apply *Rapanos* Using the *Marks* Framework as
Clarified by the Ninth Circuit's Decision in *United States v. Davis* .............. 15

              (i)   Under *Davis*, the *Rapanos* Plurality Is the Narrowest Ground
for the Decision and Is the Holding ....................................... 17

              (ii)   Under *Davis*, Justice Kennedy's Lone Concurrence Cannot
Be the Holding of *Rapanos* ................................................ 22

              (iii) The Ninth Circuit's Superseded Decision in *City of Healdsburg*
Does Not Control the *Marks* Analysis of *Rapanos* ............................... 25

                  (a)   Any District Court in This Circuit Can Hold That *Davis*
Fatally Undermines *Healdsburg* ................................... 25

                  (b)   *Healdsburg* Uses the Now Forbidden
Results-Based Approach ................................................ 26

        3.   The Plurality Opinion Is the Holding of *Rapanos*, so the Injunction
Should Extend to All Intermittent Streams and Non-abutting Wetlands ............... 28

           a.   If Justice Kennedy's Concurrence Is the Holding, Then the Injunction
Should Extend to All Intermittent Tributaries and Non-abutting
Wetlands Except Those Shown to Have a Significant Nexus ........................ 28

b.      If *Marks* Cannot be Applied, Then the Injunction Should Extend
to All Non-navigable Tributaries and Adjacent Wetlands ............................29

B.    Cattlemen Will Suffer Irreparable Harm Absent an Injunction, Because Their
Injury Is Constitutional, and Because They Cannot Feasibly Obtain Army Permits
on the Necessary Timetable and Cannot Recover the Costs of Obtaining Them ...........30

C.    The Balance of Equities and the Public Interest Both Favor an Injunction ...................34

CONCLUSION ......................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Abramski v. United States*,
573 U.S. 169 (2014)................................................................................ 14

*Alabama Legislative Black Caucus v. Alabama*,
575 U.S. 254 (2015)................................................................................ 15

*Ashe v. Swenson*,
397 U.S. 436 (1970)................................................................................ 11

*Associated Gen Contractors of Am. v. Metro. Water Dist. of S. California*,
159 F.3d 1178 (9th Cir. 1998) ............................................................. 9-10

*Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cty.*,
893 F. Supp. 301 (D.N.J. 1995) ............................................................. 30

*Canal Authority of State of Florida v. Callaway*,
489 F.2d 567 (5th Cir. 1974) ................................................................. 31

*Cardenas v. United States*,
826 F.3d 1164 (9th Cir. 2016) ............................................................... 17

*Chevron v. N.R.D.C.*,
467 U.S. 837 (1984)................................................................................ 18

*Citicorp Services, Inc. v. Gillespie*,
712 F. Supp. 749 (N.D. Cal. 1989) ........................................................ 30

*County of Maui, Hawaii v. Hawaii Wildlife Fund*,
140 S. Ct. 1462 (2020)....................................................................... 13-14

*Exxon Shipping v. Baker*,
554 U.S. 471 (2008)................................................................................ 14

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ........................................................... 30-31

*Freeman v. United States*,
564 U.S. 522 (2011)......................................................................... 16, 23

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985)................................................................................ 31

*Georgia v. Pruitt*,
326 F. Supp. 3d 1356 (S.D. Ga. 2018).............................................. 32, 35

*Georgia v. Wheeler*,
418 F. Supp. 3d 1336 (S.D. Ga. 2019)..................................................... 6

*Gibson v. American Cyanamid Co.*,
760 F.3d 600 (7th Cir. 2014) ................................................................. 28

*Gregg v. Georgia*,
428 U.S. 153 (1976)................................................................................ 16

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*,
    484 U.S. 49 (1987) ................................................................................................ 4

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ............................................................................................ 14

*Hawkes Co., Inc. v. United States Army Corps of Engineers*,
    782 F.3d 994 (8th Cir. 2015) ......................................................................... 3, 10

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ...................................... 9

*Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehabilitation Services*,
    31 F.3d 1536 (10th Cir. 1994) .......................................................................... 34

*King v. Palmer*,
    950 F.2d 771 (D.C. Cir. 1991) ........................................................................ 17

*Kucana v. Holder*,
    558 U.S. 233 (2010) ............................................................................................ 14

*Large v. Fremont Cty.*,
    670 F.3d 1133 (10th Cir. 2012) ........................................................................ 29

*Marks v. United States*,
    430 U.S. 188 (1977) ................................................................................ 15-16, 19

*Memoirs v. Massachusetts*,
    383 U.S. 413 (1966) ............................................................................................ 19

*Michigan v. United States Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011) ............................................................................ 31

*Miller v. Cal. Pac. Med. Ctr.*,
    19 F.3d 449 (9th Cir. 1994) .............................................................................. 26

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) ....................................................................... 25-26

*N. Cal. River Watch v. City of Healdsburg*,
    496 F.3d 993 (9th Cir. 2007) ...................................................................... 25, 27

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ..................................................................... 34

*National Ass'n of Mfrs. v. Department of Defense*,
    138 S. Ct. 617 (2018) ........................................................................................ 15

*Nelson v. Int'l Brotherhood of Elec. Worker, Local Union No. 46, AFL-CIO*,
    899 F.2d 1557 (9th Cir. 1990) .......................................................................... 26

*New York v. United States*, 505 U.S. 144 (1992) ........................................................................ 31

*Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) .................................................... 9

*Overstreet v. United Brotherhood of Carpenters and Joiners of Am., Local Union No. 1506*,
    409 F.3d 1199 (9th Cir. 2005) ..................................................................... 25-26

*Park Lake Resources Ltd. Liability v. U.S. Dep't of Agric.*,
   378 F.3d 1132 (10th Cir. 2004) ........................................................... 11

*Parklane Hosiery Co., Inc. v. Shore*,
   439 U.S. 322 (1979) .............................................................................. 12

*PPL Montana, LLC v. Montana*,
   565 U.S. 576 (2012) .......................................................................... 14-15

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................ 34

*Rapanos v. United States*,
   547 U.S. 715 (2006) ........................................ 2-6, 11, 14-15, 17-25, 28, 30, 32

*Reyes v. Lewis*,
   833 F.3d 1001 (9th Cir. 2016) .............................................................. 23

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .............................................................. 34

*Sackett v. EPA*,
   566 U.S. 120 (2012) .......................................................................... 14-15

*Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*,
   531 U.S. 159 (2001) ................................................................................ 4

*Sunshine Anthracite Coal Co. v. Adkins*,
   310 U.S. 381 (1940) .............................................................................. 12

*Texas Food Indus. Ass'n v. U.S. Dep't of Agriculture*,
   842 F. Supp. 254 (W.D. Tex. 1993) ...................................................... 34

*Texas v. United States Environmental Protection Agency*, No. 3:15-CV-00162,
   2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) ...................................... 35

*United States Army Corps of Engr's v. Hawkes Co., Inc.*,
   136 S. Ct. 1807 (2016) ..................................................................... 10, 15

*United States v. Bailey*,
   571 F.3d 791 (8th Cir. 2009) ................................................................ 29

*United States v. Carrizales–Toledo*,
   454 F.3d 1142 (10th Cir. 2006) ............................................................ 29

*United States v. Davis*,
   825 F.3d 1014 (9th Cir. 2016) .......................................................... 16-17, 23

*United States v. Donovan*,
   661 F.3d 174 (3d Cir. 2011) ................................................................. 29

*United States v. Gerke Excavating, Inc.*,
   464 F.3d 723 (7th Cir. 2006) ................................................................ 27

*United States v. Johnson*,
   467 F.3d 56 (1st Cir. 2006) .................................................................. 29

*United States v. Mendoza*,
    464 U.S. 154 (1984) ...................................................................................... 12-13

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985) .......................................................................................... 4

*United States. v. W.T. Grant Co.*,
    345 U.S. 629 (1953) .......................................................................................... 31

*Wildearth Guardians v. U.S. E.P.A.*, 759 F.3d 1064 (9th Cir. 2014) ...................... 9

*Winter v. National Resources Defense Council*, 555 U.S. 7 (2008) ...................... 11, 34

## Statutes

33 U.S.C. § 1251, *et seq.* .................................................................................... 2-3

33 U.S.C. § 1311(a) ............................................................................................... 3

33 U.S.C. § 1362(7) ............................................................................................... 3

33 U.S.C. § 1362(8) ............................................................................................... 3

33 U.S.C. § 1362(12) ............................................................................................. 3

## Regulations

33 C.F.R. § 328.3 (2016) ....................................................................................... 6

33 C.F.R. § 328.3(a)(2) .......................................................................................... 7

33 C.F.R. § 328.3(a)(4) ................................................................................... 7, 12, 28

33 C.F.R. § 328.3(a)(5) (1987) ............................................................................... 11

33 C.F.R. § 328.3(a)(7) (1987) ............................................................................... 12

33 C.F.R. § 328.3(c) (1987) ............................................................................... 4, 12

33 C.F.R. § 328.3(c)(1) (2016) ............................................................................... 6

33 C.F.R. § 328.3(c)(1) (2020) ............................................................................... 8


33 C.F.R. § 328.3(c)(1)(i) ....................................................................................... 7

33 C.F.R. § 328.3(c)(1)(ii) ................................................................................... 1-2, 7

33 C.F.R. § 328.3(c)(1)(iii) .................................................................................. 1-2, 7

33 C.F.R. § 328.3(c)(1)(iv) .................................................................................. 1-2, 7

33 C.F.R. § 328.3(c)(2) (2016) ............................................................................... 6

33 C.F.R. § 328.3(c)(3) (2016) ............................................................................... 6

33 C.F.R. § 328.3(c)(5) (2016) ............................................................................. 6-7

33 C.F.R. § 328.3(c)(8) .......................................................................................... 7

33 C.F.R. § 328.3(c)(12) ................................................................................... 1-2, 7-8

**Rule**

Fed. R. Civ. P. 65 ...................................................................................................... 1

**Other Authorities**

11A Wright & Miller, *Federal Practice and Procedure* (3d ed. 2013) ........................ 30

51 Fed. Reg. 41,206 (Nov. 13, 1986) ................................................................... 4, 11

80 Fed. Reg. 37,054 (June 29, 2015) ......................................................................... 6

84 Fed. Reg. 56,626 (Oct. 22, 2019) ......................................................................... 6

85 Fed. Reg. 22,250 (Apr. 21, 2020) ...................................................... 1, 7-8, 12, 33

Mandelker, Daniel R., *Practicable Alternatives for Wetlands Development
    Under the Clean Water Act*, 48 Envtl. L. Rep. News & Analysis 10894 (Oct. 2018) ............... 3

Webster's Second ...................................................................................................... 5

# MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Oregon Cattlemen's Association (Cattlemen)[1] moves under Fed. R. Civ. P. 65 for a preliminary injunction prohibiting Defendants Environmental Protection Agency (EPA) and United States Army Corps of Engineers (the Army) from enforcing the two words "or intermittent" in 33 C.F.R. § 328.3(c)(12) (effective June 22, 2020), and subsections 328.3(c)(1)(ii)-(iv) (effective June 22, 2020), in the Navigable Waters Protection Rule published by EPA and the Army at 85 Fed. Reg. 22,250, 22,338-39 (Apr. 21, 2020).[2, 3]

In compliance with Local Rule 7-1(a), the parties conferred on this motion and the request for expedited hearing upon completion of briefing. The parties made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so.

The briefing schedule for this motion was set by stipulation of the parties and ordered by the Court, ECF 95 and 96, and Cattlemen's request for expedited hearing is not intended to modify the briefing schedule. Rather, Cattlemen's request for expedited hearing is for hearing as soon as convenient for the Court once briefing on the currently ordered schedule is complete, on or before July 20, 2020, *see* ECF 96.

---

[1] "Cattlemen" refers to Plaintiff and/or its members, as appropriate to the context.

[2] Subsequent references to 33 C.F.R. § 328.3 and its subdivisions are, unless indicated otherwise, to the version effective June 22, 2020, and published in the Federal Register on April 21, 2020, at 85 Fed. Reg. at 22,338-39, and the identical provisions at 40 C.F.R. § 120.2, published the same date at 85 Fed. Reg. at 22,340-41. 40 C.F.R. 120.2(3)(xii) corresponds to 28 C.F.R. § 328.3(c)(12), and 40 C.F.R. § 120.2(3)(i)(B)-(D) corresponds to 33 C.F.R. § 328.3(c)(1)(ii)-(iv). Plaintiff asks that the Court preliminarily enjoin these identical provisions in the Army and EPA's regulations.

[3] This motion does not ask the Court to enjoin the Navigable Waters Protection Rule more generally, or to prevent any other provision of it from otherwise going into effect on its effective date of June 22, 2020. 85 Fed. Reg. at 22,250.

## I.    Introduction

This case is about the meaning of the term "navigable waters" in the Clean Water Act, 33 U.S.C. § 1251, *et seq*. "Navigable waters" are *where* Congress authorized the EPA and the Army to regulate discharges of pollutants under that Act. Conversely, EPA and the Army lack authority to regulate discharges to features that are not "navigable waters."

The issue in this motion is whether intermittent tributaries and non-navigable wetlands that don't abut navigable rivers or lakes are "navigable waters" under the Act. Cattlemen's members own farms and ranches in Oregon containing many such features. EPA and the Army claim authority under 33 C.F.R. §§ 328.3(c)(12) and (c)(1)(ii)-(iv) to regulate them; Cattlemen contend that they are not "navigable waters."

Cattlemen filed the First Supplemental Complaint on May 1, 2020, raising various claims against the Navigable Waters Protection Rule. ECF 90. In this motion, Cattlemen seek a preliminary injunction against the regulation of intermittent tributaries in § 328.3(c)(12) (Intermittent Tributary Provision), and of non-abutting wetlands in § 328.3(c)(1)(ii)-(iv) (Non-abutting Wetland Provision).

Cattlemen will prevail on the merits, because the Supreme Court has already ruled in *Rapanos v. United States*, 547 U.S. 715 (2006), that substantially similar provisions in prior regulations exceed the scope of the Clean Water Act.

Cattlemen will suffer irreparable harm if EPA and the Army are allowed to regulate their private property under the Intermittent Tributary and Non-abutting Wetland Provisions. The Provisions will require Cattlemen to spend months to years, and tens to hundreds of thousands of dollars, to obtain Army permits to farm and otherwise use their own land. The time required to obtain permits would prevent Cattlemen from working their own land despite the need for fast

action caused by weather and other unpredictable circumstances, as well as seasonal work that would be delayed for months or years awaiting permitting. Even if obtained at this cost in time and money, the resulting permits would limit the use of their property. These harms are imminent because they will apply to ongoing farming and ranching operations when the Provisions take effect on June 22, 2020, and because farming and ranching involve unpredictable weather events and other requirements.

The balance of equities and the public interest both favor an injunction. No bond is necessary for the Court to grant the requested injunction. For ease of administration, the Court should enjoin the Provisions throughout Oregon, rather than only as to Cattlemen.

## II. Legal Background: Decades of Dubious EPA and Army Regulation of Non-navigable Features Under the Clean Water Act

The Clean Water Act, 33 U.S.C. § 1251, *et seq.*, regulates discharges of "pollutants" from "point sources" to "navigable waters." 33 U.S.C. § 1311(a), § 1362(12). The Act defines "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Act defines "the territorial seas" but does not otherwise define "waters of the United States." 33 U.S.C. § 1362(8). Nonexempt discharges require a permit from either the EPA or the Army. Dredge and fill permits from the Army average more than two years, and $250,000 in consulting costs, to obtain. *See Rapanos*, 547 U.S. at 721; *see also Hawkes Co., Inc. v. United States Army Corps of Engineers*, 782 F.3d 994, 1001 (8th Cir. 2015). Once obtained, dredge and fill permits substantially limit how property encumbered by "navigable waters" can be used by its owner. *See generally* Daniel R. Mandelker, *Practicable Alternatives for Wetlands Development Under the Clean Water Act*, 48 Envtl. L. Rep. News & Analysis 10894 (Oct. 2018).

A person engaged in unpermitted, nonexempt discharges or permit violations faces citizen suits, administrative cease-and-desist and compliance orders, administrative penalties, civil actions for

monetary civil penalties and injunctive relief, and criminal prosecution. *See generally*, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 52-53 (1987). These severe burdens make it critically important that the regulated public know what is meant by "navigable waters."

Starting in the 1970s, the Army adopted increasingly broad regulations defining "navigable waters." *See generally United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123-24 (1985). In *Riverside Bayview Homes* the Supreme Court held that the Army reasonably interpreted "navigable waters" to include a non-navigable wetland abutting a navigable-in-fact creek. *Id.* at 135. *Riverside Bayview Homes* did not address whether "navigable waters" include wetlands that don't abut navigable-in-fact waters. *Id*. at 124 n.2; *id*. at 131 n.8.

In 1986 the Army adopted an updated definition that stretched the term "navigable waters" to include interstate waters, intrastate waters with various relationships to interstate or foreign commerce, all non-navigable tributaries of such waters, and all non-navigable wetlands adjacent to (broadly defined as bordering, contiguous, or neighboring) such tributaries and other waters. *See* 33 C.F.R. § 328.3(a)(1)-(7), and § 328.3(c) (1987) (1986 Regulations). The Army interpreted the 1986 Regulations to include isolated waters used by migratory birds (the Migratory Bird Rule) and all water used to irrigate crops sold in interstate commerce. *Rapanos*, 547 U.S. at 725 (citing 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986)).

The Supreme Court issued two adverse decisions against the 1986 Regulations. In *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*), the Court invalidated the Migratory Bird Rule as beyond the scope of "navigable waters" under the Act. 531 U.S. at 172. *SWANCC* narrowed *Riverside Bayview Homes* by emphasizing that the word "navigable" in the text of the Act demonstrates that Congress was focused on its "traditional jurisdiction over waters that were . . . navigable in fact." *Id.*

Then in a fractured opinion in *Rapanos*, the Supreme Court invalidated the tributary and adjacent wetlands subsections of the 1986 Regulations as exceeding the scope of the statutory term "navigable waters." The issue in *Rapanos* was whether "navigable waters" include non-navigable tributaries to navigable-in-fact waterways and wetlands that do not physically abut navigable-in-fact waterways. 547 U.S. at 728, *id.* at 759 (Kennedy, J., concurring). The Court remanded the case because these two provisions of the 1986 Regulations, on which the lower court relied, invalidly claimed authority over all such tributaries and wetlands. *Id.* at 757.

The four-Justice *Rapanos* plurality determined that the language, structure, and purpose of the Clean Water Act all limit federal authority over non-navigable tributaries to "relatively permanent, standing or continuously flowing bodies of water" commonly recognized as "streams, . . . oceans, rivers, and lakes[.]" *Id.* at 739 (brackets omitted) (quoting Webster's Second 2882). In its analysis the plurality repeatedly emphasized that intermittent (*i.e.*, flowing more often than ephemerally but not continuously) drainages are not regulated by the Act, even mocking the notion. *Id.* at 733.

The plurality also limited regulation of non-navigable wetlands to only those that physically abut relatively permanent and continuously flowing waters, such that they have an immediate surface water connection which renders the wetland and water body "indistinguishable." *Id.* at 755.

Justice Kennedy joined the plurality in the judgment that the tributary and adjacent wetland subsections of the 1986 Definition were overbroad. But he proposed a broader interpretation of "navigable waters" than the plurality: the "significant nexus" test. *Id.* at 759 (Kennedy, J., concurring). Under this view, the government can regulate a non-abutting wetland if it significantly affects the physical, chemical, and biological integrity of a navigable-in-fact waterway. *Id.* at 779

(Kennedy, J., concurring). Justice Kennedy wrote that wetlands could be analyzed under this standard either standing alone or in combination with features similarly situated within an otherwise undefined "region." *Id.* at 780 (Kennedy, J., concurring).

In 2015, after several years of effort to address the Supreme Court's decisions in *SWANCC* and *Rapanos*, EPA and the Army adopted new regulations (the 2015 Regulations) redefining "navigable waters." 33 C.F.R. § 328.3 (2016); 80 Fed. Reg. 37,054 (June 29, 2015).

The 2015 Regulations defined "tributary" as having a bed and bank and an ordinary high-water mark, and contributing flow to (1) navigable-in-fact waters, plus all waters which are, were, or reasonably could be used more generally in interstate commerce, (2) all interstate waters, including interstate wetlands, and (3) the territorial seas. 33 C.F.R. § 328.3(c)(3) (2016). The 2015 Regulations also established several criteria for regulation of "adjacent waters" based on Justice Kennedy's significant nexus analysis in *Rapanos*, *see* 33 C.F.R. § 328.3(c)(1), (2), (5) (2016).

Several lawsuits challenged the 2015 Regulations, including the original complaint in this action. ECF 1. On July 26, 2019, this Court in this action preliminarily enjoined the 2015 Regulations in the State of Oregon. ECF 58. On August 21, 2019, the U.S. District Court for the Southern District of Georgia ruled on summary judgment that the 2015 Regulations violated the Clean Water Act. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019). That court permanently enjoined and remanded the 2015 Regulations without vacatur. *Id*. at 1382-83.

On October 22, 2019, partially in response to the decision in *Georgia v. Wheeler*, EPA and the Army published a regulation (the Repeal and Recodify Rule) that (1) repeals the 2015 Regulations, and (2) readopts the 1986 Regulations. 84 Fed. Reg. 56,626 (Oct. 22, 2019).[4]

---

[4] On March 2, 2020, this Court vacated the injunction against the 2015 Regulations after the Ninth Circuit, in Defendant-Intervenor Columbia Riverkeeper's appeal of the preliminary injunction, agreed that the repeal of the 2015 Regulations mooted the appeal. ECF 81.

On April 21, 2020, EPA and the Army published yet another regulation in the Federal Register called the Navigable Waters Protection Rule ("Navigable Waters Protection Rule" or "2020 Regulations"). 85 Fed. Reg. 22,250 (Apr. 21, 2020). The Navigable Waters Protection Rule regulates, among other aquatic features:

- Tributaries, 33 C.F.R. § 328.3(a)(2), which are rivers, streams, or similarly naturally occurring (whether or not altered or relocated) surface water channels (including ditches that relocate or are constructed in them, or that drain adjacent wetlands) that, in a typical year, contribute intermittent or perennial surface water flow to other regulated waters, 33 C.F.R. § 328.3(c)(12). Perennial "means surface water flowing continuously year-round." 33 C.F.R. § 328.3(c)(8). Intermittent "means surface water flowing continuously during certain times of the year and more than in direct response to precipitation." 33 C.F.R. § 328.3(c)(5). 85 Fed. Reg. at 22,338-39. The intermittent non-navigable tributaries regulated by Section 328.3(a)(2) can be both negligible in volume and very limited in duration. The definition concededly includes the "merest trickle" because it has no lower bound for the volume of flow necessary to be a tributary. 85 Fed. Reg. at 22,291. The Rule also has no minimum duration of flow for a tributary to be regulated, other than that it flow more than in direct response to precipitation. *Id.* at 22,292.

- Adjacent wetlands, 33 C.F.R. § 328.3(a)(4), which are wetlands that abut, 33 C.F.R. § 328.3(c)(1)(i), or are flooded by, 33 C.F.R. § 328.3(c)(1)(ii), other regulated non-wetland waters, or are physically separated from them only by natural, 33 C.F.R. § 328.3(c)(1)(iii), or permeable artificial, 33 C.F.R. § 328.3(c)(1)(iv), barriers. 85 Fed. Reg. at 22,338.

Cattlemen ask this Court to preliminarily enjoin the following provisions of the definitions of regulated tributaries and adjacent wetlands in the Navigable Waters Protection Rule, as indicated by strike through in the text of these provisions below:

§ 328.3(c)(1): The term *adjacent wetlands* means wetlands that: (i) Abut, meaning to touch at least at one point or side of, a water identified in paragraph (a)(1), (2), or (3) of this section~~; (ii) [a]re inundated by flooding from a water identified in paragraph (a)(1), (2), or (3) of this section in a typical year; (iii) [a]re physically separated from a water identified in paragraph (a)(1), (2), or (3) of this section only by a natural berm, bank, dune, or similar natural feature; or (iv) [a]re physically separated from a water identified in paragraph (a)(1), (2), or (3) of this section only by an artificial dike, barrier, or similar artificial structure so long as that structure allows for a direct hydrologic surface connection between the wetlands and the water identified in paragraph (a)(1), (2), or (3) of this section in a typical year, such as through a culvert, flood or tide gate, pump, or similar artificial feature~~.

§ 328.3(c)(12): The term *tributary* means a river, stream, or similar naturally occurring surface water channel that contributes surface water flow to a water identified in paragraph (a)(1) of this section in a typical year either directly or through one or more waters identified in paragraph (a)(2), (3), or (4) of this section. A tributary must be perennial ~~or intermittent~~ in a typical year.[5]

85 Fed. Reg. at 22,338-39.

---

[5] Cattlemen omit the balance of the definition of "tributary" for brevity, and clarify that they do not ask the Court to enjoin any other provision of it.

**ARGUMENT**

I.      **Cattlemen Has Standing Because the Intermittent Tributary
        and Non-abutting Adjacent Wetland Provisions Require Them
        to Get the Army's Permission to Work Their Own Land**

Plaintiff has associational standing to challenge provisions of the Navigable Waters Protection Rule. The Oregon Cattlemen's Association (OCA) is a nonprofit trade organization that represents over 1,800 members throughout the State of Oregon, including ranchers, dairymen, business allies, and avid supporters of the cattle industry. OCA lobbies on behalf of its members to advance economic prosperity, exhibit a solid political presence in legislative actions, and protect and encourage sound and sustainable ranching and business practices. OCA members are subject to and adversely affected by the Navigable Waters Protection Rule and oppose its implementation. Third Jerome Rosa Declaration ¶¶ 4-14, filed herewith..

An association can sue on behalf of its membership when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343, (1977)); *see also WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1064, 1070 (9th Cir. 2014).

OCA's membership will suffer ongoing injury if the Intermittent Tributary and Non-abutting Adjacent Wetland Provisions take effect; an injunction would prevent those injuries, giving those members standing to sue in their own right. *See Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. California*, 159 F.3d 1178, 1181 (9th Cir. 1998). Many of Cattlemen's members hold beneficial interests in property that fall under federal regulation because of the tributary and wetland provisions of the Navigable Waters Protection Rule. Jerome Rosa

Declaration ¶¶ 4-6, ECF 19; Supp. Rosa Decl., ¶ 3, ECF 47; Third Rosa Decl., ¶¶ 5-6, 13-15; Curtis Martin Declaration ¶ 11, ECF 18; Supp. Martin Decl. ¶¶ 3-4, ECF 46. This will require landowners to seek federal permit approval (at significant cost) to use their property. *Id.* Or, it will require Cattlemen to seek a determination from the Army or a private party expert whether the Navigable Waters Protection Rule applies to them. *See Hawkes Co., Inc. v. U.S. Army Corps of Engineers*, 782 F.3d 994, 1003 (8th Cir. 2015) (Kelly, J., concurring) ("[M]ost laws do not require the hiring of expert consultants to determine if they even apply to you or your property."), *aff'd*, 136 S. Ct. 1807 (2016). Because of the Navigable Waters Protection Rule's illegal interpretation of "navigable waters," Cattlemen will be required to curtail use of their property or obtain federal approval of new and ongoing land-use projects at a cost of tens or hundreds of thousands of dollars and years of delay. Curtis Martin Declaration ¶¶ 7-9, ECF 18; Supp. Martin Decl. ¶¶ 3-4, ECF 46; Supp. Rosa Decl., ¶ 3, ECF 47; Third Rosa Decl. ¶ 14.

Preventing these injuries is germane to Cattlemen's purpose because Cattlemen seeks to promote the cattle industry and to advocate for sensible environmental regulations. Jerome Rosa Declaration ¶ 3, ECF 19; Third Rosa Decl., ¶¶ 4, 8. The Intermittent Tributary and Non-abutting Adjacent Wetland Provisions impose costly and unjustified burdens on the industry. And, because Cattlemen seeks to enjoin these two provisions on their face, there is no need for the direct participation of its individual members. *Associated Gen. Contractors*, 159 F.3d at 1181 ("Individualized proof from the members is not needed where, as here, declaratory and injunctive relief is sought rather than monetary damages."). Accordingly, Cattlemen has standing.

## II. The Court Should Preliminarily Enjoin the Intermittent Tributary and Non-abutting Wetland Provisions

A preliminary injunction preventing the enforcement of the Intermittent Tributary and Non-abutting Wetland Provisions is appropriate because: (1) Cattlemen is likely to succeed on the

merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. National Resources Defense Council*, 555 U.S. 7, 20 (2008). Here, all four elements strongly favor an injunction.

### A. Cattlemen Will Prevail on the Merits

### 1. The Judgment Against the Government in *Rapanos* Controls in This Case Under Issue Preclusion

Issue preclusion "bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." *Park Lake Resources Ltd. Liability v. U.S. Dep't of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004) (citations omitted). Issue preclusion attaches when

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Id*. (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)). Issue preclusion can be invoked by any third party against a party in privity to the parties in the prior decision. *Id*. at 1138 (citing cases). Issue preclusion bars EPA and the Army from arguing that the Intermittent Tributary and Non-abutting Wetland Provisions are lawful.

First, the issue in this case is identical to the issue in *Rapanos*: whether the agencies may regulate (1) all intermittent tributaries, and (2) non-abutting wetlands, under the Clean Water Act and the Constitution. *Rapanos*, 547 U.S. at 724-25. The 1986 Regulations included all intermittent tributaries, 33 C.F.R. § 328.3(a)(5) (1987), 51 Fed. Reg. 41,206, 41,250-51 (Nov. 13, 1986) (regulating all "tributaries"); *see Rapanos*, 547 U.S. at 726-27 (agencies used 1986 definition of tributary to regulate intermittent drainages), which *Rapanos* rejected, 547 U.S. at 733-34. The

Navigable Waters Protection Rule identically regulates all intermittent tributaries, so on this provision the issues in this case and in *Rapanos* are identical. And the 1986 Regulations regulated the same non-abutting wetlands that the Navigable Waters Protection Rule does. *Compare* 33 C.F.R. § 328.3(a)(7), (c) (1987) (regulating adjacent wetlands defined as "bordering, contiguous, or neighboring") *with* 33 C.F.R. § 328.3(a)(4), (c)(1), 85 Fed. Reg. at 22,338-39 (regulating non-abutting wetlands that are flooded by other regulated waters or separated from them by barriers). So on this second provision, the issue in the two cases is identical.

Second, *Rapanos* was adjudicated on the merits at the Supreme Court of the United States. Nothing could be more final in the federal courts. Third, the United States was the respondent in *Rapanos*, and agencies of the United States are in privity with the United States. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402-03 (1940). The Army was also the respondent in *Carabell*, which was a companion case to *Rapanos* and part of the same judgment. Finally, the United States had a full and fair opportunity to litigate the *Rapanos* case. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331-32 (1979) (appeal to circuit court after trial before district court affords full and fair opportunity).

Cattlemen can invoke issue preclusion against the federal government in this case despite *United States v. Mendoza*, 464 U.S. 154, 162 (1984) (nonmutual offensive issue preclusion does not run against the government in certain cases). In *Mendoza*, the Supreme Court decided that the United States could not be precluded from litigating a constitutional issue it had lost in a decision of the Northern District of California, which the government elected not to appeal. *Id*. at 157. The Supreme Court focused its analysis in *Mendoza* on the long practice of allowing important constitutional issues to percolate through the circuit courts before final resolution in the Supreme Court. *Id*. at 160. Estopping the government with unappealed district court decisions would prevent

this percolation. *Id*. The Court further emphasized the significance of the Solicitor General's discretion whether to appeal district court decisions, and which circuit court decisions to petition to the Supreme Court. Precluding relitigation of issues based on district court decisions would upend the Solicitor General's decision making. *Id*. at 161.

None of these concerns apply to Supreme Court decisions, and *Mendoza* correspondingly limits its holding to "relitigation of issues such as those involved in this case," *id*. at 162, i.e., issues resolved by a lower court which could still be percolated through the courts of appeal and which implicate the Solicitor General's discretion in filing appeals and petitions for certiorari.

Defendants are barred under issue preclusion from defending the validity of the Intermittent Tributary and Non-abutting Wetland Provisions. Cattlemen are more than likely to succeed on the merits.

> ## 2. The Scope of the Preliminary Injunction Depends on Which *Rapanos* Opinion Is the Holding

Although *Rapanos* provided a clear majority as to the result, the judgment rested on a 4-1 split as to its rationale. So the Court must determine which of the opinions supporting the judgment is the holding: the plurality or Justice Kennedy's concurrence.

> ### a. The Supreme Court Has Established That the Plurality Is the Holding of *Rapanos*

The Supreme Court recently showed that it reads the plurality as the controlling opinion in the *Rapanos* decision. In *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020) the Court addressed the question of whether, under the Clean Water Act, the movement of a pollutant from an injection well (a point source) through groundwater (not a point source) to the ocean (a navigable water) is a regulated "discharge." 140 S. Ct. at 1468. The Court issued a six-Justice majority opinion authored by Justice Breyer, *id*. at 1468-78, a concurrence by Justice Kavanaugh, *id*. at 1478-79 (Kavanaugh, J., concurring), and two separate dissents by Justices

Thomas (joined by Justice Gorsuch), *id*. at 1479-82 (Thomas, J., dissenting), and Alito, *id*. at 1482-92 (Alito, J., dissenting). All four of these opinions cite the *Rapanos* plurality for its discussion of point sources under the Act, *see Rapanos*, 547 U.S. at 743-44, and apply that discussion in disparate ways to whether pollutants moving through groundwater are "added" to the receiving ocean waters so as to constitute a discharge. *See* 140 S. Ct. at 1475 (citing *Rapanos*, 547 U.S. at 743) (nothing in statute requires that a pollutant move "directly" or "immediately" from its origin to navigable waters); *id*. at 1478 (Kavanaugh, J., concurring) (majority reading of "discharge" "adheres to the interpretation set forth in Justice Scalia's plurality opinion in *Rapanos*"); *id*. at 1482 (Thomas, J., dissenting) (*Rapanos* plurality does not decide the issue in this case); *id*. at 1487 n.5 (Alito, J., dissenting) (*Rapanos* plurality supports "daisy chaining" point sources).

While the four authors in *County of Maui* disagree about the application of the *Rapanos* plurality to the definition of "discharge," they all agree that the plurality is the opinion in *Rapanos* that bears (or not) on this question. In other words, the *Rapanos* plurality is the precedent that the Supreme Court looked to in answering the question presented in *County of Maui*.

This is consistent with and grows organically from the Court's prior citations to *Rapanos*. The Supreme Court cited *Rapanos* in nine cases before *County of Maui*. In *all* of those cases, the Court cites the *Rapanos* plurality. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 706 (2006) (Thomas, J., dissenting) (citing *Rapanos*, 547 U.S. 715); *Exxon Shipping v. Baker*, 554 U.S. 471, 508 n.21 (2008) (citing *Rapanos*, 547 U.S. at 749); *Kucana v. Holder*, 558 U.S. 233, 252-53 (2010) (citing *Rapanos*, 547 U.S. at 752); *PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012) (citing *Rapanos*, 547 U.S. at 730-31); *Sackett v. EPA*, 566 U.S. 120, 123 (2012) (citing *Rapanos*, 547 U.S. 715); *id*. at 133 (Alito, J., concurring) (citing *Rapanos*, 547 U.S. at 732-39); *Abramski v. United States*, 573 U.S. 169, 198 (2014) (Scalia, J., dissenting) (citing *Rapanos*, 547 U.S. at 752);

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268 (2015) (citing *Rapanos*, 547 U.S. at 757); *United States Army Corps of Engr's v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1811-12, 1815 (2016) (citing *Rapanos*, 547 U.S. at 721-22); *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 625 (2018) (citing *Rapanos*, 547 U.S. at 723); *id.* (citing *Rapanos*, 547 U.S. at 729, 757); *id.* at 633 (citing *Rapanos*, 547 U.S. at 729). By contrast, the Court has only cited the Justice Kennedy's *Rapanos* concurrence once, in his opinion in *PPL Montana*, immediately following his citation to the plurality. 565 U.S. at 592 (citing *Rapanos*, 547 U.S. at 761 (Kennedy, J., concurring in judgment)).

This pattern is clearest in the Supreme Court's post-*Rapanos* cases that address questions arising under the Clean Water Act. *See Sackett v. EPA*, 566 U.S. at 123 (citing *Rapanos*, 547 U.S. 715); *id*. at 133 (Alito, J., concurring) (citing *Rapanos*, 547 U.S. at 732-39); *Hawkes Co.*, 136 S. Ct. at 1811-12, 1815 (citing *Rapanos*, 547 U.S. at 721-22); *National Ass'n of Mfrs.*, 138 S. Ct. at 625 (citing *Rapanos*, 547 U.S. at 723); *id.* (citing *Rapanos*, 547 U.S. at 729, 757); *id*. at 633 (citing *Rapanos*, 547 U.S. at 729). And this pattern culminates in *County of Maui*, in which all four opinions debate how the *Rapanos* plurality bears on the "discharge" question. None of the Supreme Court's post-*Rapanos* Clean Water Act cases cite the Kennedy concurrence; they all cite the plurality.

But even without this clear and progressively more robust adoption of the *Rapanos* plurality by the Supreme Court itself, lower courts can identify the plurality as the holding of *Rapanos* by applying *Marks v. United States*, 430 U.S. 188 (1977).

> **b.    This Court Must Apply *Rapanos* Using the *Marks* Framework as Clarified by the Ninth Circuit's Decision in *United States v. Davis***

*Marks* holds that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as

that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks*, 430 U.S. at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).

The Ninth Circuit recently provided definitive guidance for applying *Marks* in *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc), which examined a 4-1-4 split decision in *Freeman v. United States*, 564 U.S. 522 (2011). *Davis*, 825 F.3d at 1019. *Freeman* addressed whether a defendant who entered into a plea agreement could take advantage of a sentence reduction under the Sentencing Reform Act. *Davis*, 825 F.3d at 1019. Four Justices in the *Freeman* plurality held the defendant could almost always take advantage of the sentence reduction, so long as the sentence imposed reflected the Sentencing Guidelines then in effect. *Id*. Justice Sotomayor separately concurred, arguing that a defendant could only take advantage of the sentence reduction when the plea agreement incorporates or uses the Sentencing Guidelines. *Id*. at 1019-20. Four dissenting Justices would have held a defendant relying on a plea agreement could never take advantage of the sentence reduction under the Sentencing Reform Act. *Id*. at 1019. To determine the controlling *Freeman* opinion, the Ninth Circuit started with *Marks*:

> When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.

*Davis*, 825 F.3d at 1020 (quoting *Marks*, 430 U.S. at 193).

The Ninth Circuit observed that after forty years, the courts are still struggling "to divine what the Supreme Court meant by 'the narrowest grounds,'" with two approaches emerging. *Id*. (quoting *Marks*, 430 U.S. at 193). One is the reasoning-based approach, which seeks common reasoning among the concurring opinions to see if one is a logical subset of the other, broader opinion. *Id*. at 1021. "In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who

support the judgment." *Id*. at 1020 (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). The other approach is results-based and defines "narrowest grounds" as "the rule that 'would necessarily produce results with which a majority of the Justices from the controlling case would agree.'" *Id*. at 1021.

Of the two, *Davis* rejected the results-based approach and held that this Circuit is to use the reasoning-based approach:

> To foster clarity, we explicitly adopt the reasoning-based approach to applying *Marks*. . . . A fractured Supreme Court decision should only bind the federal courts of appeal when a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably be described as a logical subset of the other. When no single rationale commands a majority of the Court, only the specific result is binding on lower federal courts.

*Id*. at 1021-22 (citation and footnote omitted).

Shortly after *Davis*, the Ninth Circuit held that only opinions supporting the judgment can be examined as potential logical subsets of each other in determining a holding of the Supreme Court under *Marks*. *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) ("narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices *who support the judgment*" (emphasis added) (quoting *Davis*, 825 F.3d at 1020)). While a dissent may be useful in assessing the reasoning of the opinions supporting the judgment and identifying which is the logical subset of the other, a dissent itself cannot be either the broader or narrower opinion for determining the holding.

### (i)    Under *Davis*, the *Rapanos* Plurality Is the Narrowest Ground for the Decision and Is the Holding

The key to the question "what is the narrowest opinion" in *Rapanos* is identifying what the judgment did. The Court remanded the case to the Sixth Circuit for further proceedings, after determining that the Agencies and the lower courts had not properly defined "navigable waters." 547 U.S at 757. The Supreme Court arrived at this judgment through two different interpretations

of "navigable waters." As such, the "narrowest opinion" is the one with the narrowest meaning of "navigable waters."

The plurality and concurrence show this. 547 U.S. at 729 ("In these consolidated cases, we consider whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute "waters of the United States" within the meaning of the Act."); *id.* (addressing landowners' contentions about the meaning of "navigable waters" and "waters of the United States"); *id.* at 739 (rejecting Army's "expansive interpretation" as an "[im]permissible construction of the statute") (quoting *Chevron v. N.R.D.C., Inc.*, 467 U.S. 837, 843 (1984)); *see also* 547 U.S. at 759 (Kennedy, J., concurring) ("These consolidated cases require the Court to decide whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact."); *id.* at 759 ("The word 'navigable' in the Act must be given some effect.").

And the judgment in *Rapanos* confirms that the only issue in the case is how to interpret the Act. "We vacate the judgments of the Sixth Circuit . . . and remand both cases for further proceedings." 547 U.S. at 757. Both opinions which supported this judgment did so because of an interpretation of the statute which differed from that applied by the Sixth Circuit. *Id.* ("Because the Sixth Circuit applied the wrong standard to determine if these wetlands are covered 'waters of the United States . . . .'"); *id.* at 757 (Kennedy, J., concurring) ("navigable waters" must have "significant nexus" to navigable in fact waters, supports remand "for proper consideration of the nexus requirement"). The only direction that the Sixth Circuit got from the Supreme Court in its further proceedings were the two opinions supporting remand, and the only legal rules on offer in either of those opinions is the meaning of "navigable waters." So, which of these two opinions is a logical subset of the other depends on how each interpreted the statute.

This accords with *Marks*, which applied the Supreme Court's prior fractured decision in *Memoirs v. Massachusetts*, 383 U.S. 413 (1966). *Marks*, 430 U.S. at 193-94 (discussing *Memoirs*, 383 U.S. 413). *Memoirs* was a split decision, with three Justices stating that the First Amendment protected pornographic material unless it met three tests. 383 U.S. at 418. Two other Justices would read the First Amendment more broadly to protect all obscene material without limit. *Id.* at 421, 424 (Black and Douglas, JJ., concurring). *Marks* says that the narrower reading of the applicable constitutional provision controlled. Similarly, a reasoning-based approach to applying *Marks* to *Rapanos* must look at how broadly or narrowly the two opinions supporting the judgment interpret the applicable statutory provision.

In *Rapanos*, the Supreme Court ruled that the term "navigable waters" in the Act was narrower than the Agencies' then-applicable regulations defining the term. 547 U.S. at 734 ("The plain language of the statute simply does not authorize this 'Land Is Waters' approach to federal jurisdiction."); *id*. at 759 (Kennedy, J., concurring) (lower court did not apply proper standard to determine whether wetlands not abutting navigable waters were jurisdictional). The Justices supporting the judgment adopted concentric rationales for the judgment. The plurality interprets "navigable waters" narrowly, while Justice Kennedy interprets it more broadly.

The point of departure between them is the plurality's narrow reading of the term "significant nexus" (as describing only the type of physical intermingling that prevents a clear distinction between the waters and the wetlands) and Justice Kennedy's broad reading of it (as categorically encompassing abutting wetlands, in accord with the plurality, and also including others on a case-by-case basis, with which the plurality disagreed). *Compare Rapanos*, 547 U.S. at 754-55 (disagreement with Kennedy's broad reading of "significant nexus"), *with id*. at 774 (Kennedy, J., concurring) (prior Supreme Court decisions allow regulation of wetlands not

physically abutting tributaries).

The plurality summed it up this way:

> [E]stablishing that wetlands . . . are covered by the Act requires two findings: first, that the adjacent channel contains a "wate[r] of the United States," (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Rapanos*, 547 U.S. at 742.

Justice Kennedy agreed with important aspects of this. *Rapanos*, 547 U.S. at 759-60. "The plurality's opinion begins from a correct premise." That being that the Act regulates "at least some waters that are not navigable in the traditional sense." *Id*. at 767. But, "[f]rom this reasonable beginning the plurality proceeds to impose two *limitations* on the Act[.]" *Id*. at 768 (emphasis added). These "limitations" are the two elements of the plurality's rule: that "navigable waters" are only "relatively permanent, standing or flowing bodies of water" and that wetlands are only subject to the Act if they have a "continuous surface connection" to relatively permanent, standing, or flowing bodies of water. *Id*. at 768-69.

On relative permanence ("the plurality's first requirement," *id.* at 769), Justice Kennedy said the plurality's reading of *Riverside Bayview Homes* was too narrow. *Rapanos*, 547 U.S. at 771. Justice Kennedy concluded that the Army could read "waters" more broadly to include "impermanent streams." *Id*. at 770.

On "[t]he plurality's second limitation," Justice Kennedy disagreed that *Riverside Bayview Homes* limits regulated wetlands to just those which abut navigable waters so closely that they cannot be distinguished, or even that there be a continuous surface connection, however close. *Rapanos*, 547 U.S. at 772-73. Justice Kennedy also disagreed with the plurality's reading of *SWANCC* as requiring a surface connection between wetlands and navigable waters. *Rapanos*, 547

U.S. at 774. Justice Kennedy concluded that the Army's broader definition of "adjacent" would be reasonable if limited to those wetlands with a significant nexus. *Id*. at 775.

In short, Justice Kennedy's view is that the plurality reads "navigable waters" in the statute, the holding of *Riverside Bayview Homnes*, and the term "significant nexus" used in *SWANCC* too narrowly. By Justice Kennedy's own critique of the plurality, he thinks it narrower than his reasoning.

At the same time, he agrees that those waters the plurality generally considers "navigable" are covered by the Act. Justice Kennedy reads the Act as applicable to both permanent and "impermanent streams." *Id*. at 770. So, the relatively permanent tributaries which the plurality reads the Act as covering are a logical subset of the broader category of both permanent and impermanent streams which the concurrence recognizes.

Justice Kennedy also agreed with the plurality that wetlands which cannot easily be distinguished from covered tributaries are categorically covered by the Act. *Id*. at 780. The plurality would limit covered wetlands to this category, which is a subset of the broader group of adjacent waters to which Justice Kennedy reasons the Act may apply on a case-by-case basis. And Justice Kennedy's reasoning as to directly abutting wetlands is that they categorically have the "significant nexus" that his rule requires. *Id*. Both opinions categorically include this class of wetlands.

The relatively permanent tributaries and directly abutting wetlands covered by the plurality's rule are a logical subset of Justice Kennedy's broader reading of "navigable waters," and Justice Kennedy sees these waters as a subset of those his rule would include.

The concurrence does state that some waters meeting the plurality's test might lack a "significant nexus." *Id*. at 776. But this is not a fair reading of the plurality. The plurality limits its

coverage of non-navigable tributaries to relatively permanent waters that can properly be described as lakes, rivers, and streams. *Id*. at 742. Justice Kennedy asserts that some of these waters might not have a significant nexus, without explaining how. *Id*. at 776-77 (Kennedy, J., concurring).

The concurrence never gives examples of relatively permanent tributaries that would not be covered by his rule, and misreads the plurality as applying the Act to "wetlands (however remote)" so long as there is a surface connection, however minor. *Id*. at 776. But the plurality is limited to those relatively permanent waters that would be called lakes, rivers, or streams "in normal parlance." *Id*. at 742. One using "normal parlance" would not call a mere trickle a stream.

Nor does the plurality admit regulation of wetlands based on a mere surface connection, "however remote." The plurality specifically rejects this. *Id*. at 742. Justice Kennedy's misreading of the plurality's reasoning cannot stand in for its actual reasoning. And that actual reasoning is a logical subset of Justice Kennedy's.

The *Rapanos* dissent also opines that "Justice Kennedy's approach . . . treats more of the Nation's waters as within the Corps' jurisdiction" than the plurality, and that it would be a rare case when the plurality test is met and Justice Kennedy's is not. *Rapanos*, 547 U.S. at 810 n.14 (Stevens, J., dissenting). No example is offered by the dissent either of a feature that would meet the plurality standard but lack a "significant nexus."

Following the reasoning-based approach to applying *Marks*, as required under *Davis*, the proper reading of *Rapanos* is that the plurality opinion is a logical subset of Justice Kennedy's reasoning, and on the question of what "navigable waters" means in the Clean Water Act, the plurality is the narrower opinion and is the holding.

**(ii)**      **Under *Davis*, Justice Kennedy's Lone Concurrence Cannot Be the Holding of *Rapanos***

In holding that Justice Sotomayor's lone concurrence in *Freeman* cannot be the case's

holding under *Marks*, *Davis* notes that both the plurality and dissent strongly criticized Justice Sotomayor's concurrence. *Davis*, 825 F.3d at 1020 (citing *Freeman*, 564 U.S. at 533; *id.* at 550 (Roberts, C.J., dissenting)). "The dissenting opinion accurately stated that the plurality and concurrence 'agree on very little except the judgment.'" *Davis*, 825 F.3d at 1020 (quoting *Freeman*, 564 U.S. at 554 (Roberts, C.J., dissenting)).

Following on this analysis, and applying the reasoning-based approach of *Davis*, it is difficult to see how any single-Justice opinion of the Supreme Court could be considered the holding under *Marks*, where all eight other Justices criticize the one Justice's reasoning. *See Reyes v. Lewis*, 833 F.3d 1001, 1007-09 (9th Cir. 2016) (Judge Callahan, dissenting from denial of rehearing en banc). "Under the reasoning-based *Marks* rule, reasoning expressly rejected by at least seven Justices cannot be elevated to the status of controlling Supreme Court law." *Id.* at 1008.

As with *Freeman*, both the plurality and the dissent in *Rapanos* criticized Justice Kennedy's reasoning.

The plurality opinion broadly critiques Justice Kennedy's concurring opinion. *Rapanos*, 547 U.S. at 753-57. It starts by rejecting Justice Kennedy's broad reading of the expression "significant nexus" (allowing a case-by-case determination as to non-abutting wetlands, which may be jurisdictional based on ecological as well as hydrological connections) as being irreconcilable with both *Riverside Bayview* and *SWANCC*. *Rapanos*, 547 U.S. at 753-54 (*Riverside Bayview* rejected case-by-case determinations, and *SWANCC* rejected mere ecological connection for "physically unconnected ponds"). From this, the plurality states: "In fact, Justice Kennedy acknowledges that neither *Riverside Bayview* nor *SWANCC* required, for wetlands abutting navigable-in-fact waters, the case-by-case ecological determination that he proposes for wetlands that neighbor nonnavigable tributaries." *Id.* at 754.

The plurality insists that the primary error in Justice Kennedy's analysis is what they find to be his failure to read *Riverside Bayview* and *SWANCC* with the text of the Act in mind. *Rapanos*, 547 U.S. at 754; *id.* at 755 ("Only by ignoring the text of the statute and by assuming that the phrase of *SWANCC* ('significant nexus') can properly be interpreted in isolation from that text does Justice Kennedy reach the conclusion that he has arrived at."). According to the plurality, Justice Kennedy bases his interpretation on the purpose rather than the text of the Act, but in doing so also fails to address federalism, which is the second coordinate purpose along with water quality. *Id.* at 755-56.

The plurality views Justice Kennedy's interpretation of "navigable waters" as narrower than the dissent's but broader than theirs. *Id.* at 756 ("Justice Kennedy's disposition would disallow some of the Corps' excesses, and in that respect is a more moderate flouting of the statutory command than Justice Stevens'.").

In short, the plurality rejects Justice Kennedy's reasoning on two grounds: too broad a reading of the phrase "significant nexus," and too broad a reading of the statute due to focusing on one of its two purposes to the exclusion of its other purpose and its text.

The dissent for its part "[did] not share [Justice Kennedy's] view that we should replace regulatory standards that have been in place for over 30 years with a judicially crafted rule distilled from the term 'significant nexus' as used in *SWANCC*." *Rapanos*, 547 U.S. at 807 (Stevens, J., dissenting). Further, the dissent objected to the fact that Justice Kennedy's case-by-case "approach will have the effect of creating additional work for all concerned parties." *Id.* at 809 (Stevens, J., dissenting). Finally, "[u]nlike Justice Kennedy, [the dissent saw] no reason to change *Riverside Bayview*'s approach—and every reason to continue to defer to the Executive's sensible, bright-line rule." *Id.* (Stevens, J., dissenting).

Hence, as with the plurality, the dissent objected to the Kennedy case-by-case approach, and considered his broad reading of "substantial nexus" to go beyond the meaning of the term as used in *SWANCC* and as a misreading of the Court's holding in *Riverside Bayview*. *Rapanos*, 547 U.S. at 807-09 (Stevens, J., dissenting). And fundamentally, the dissent rejected Justice Kennedy's refusal to defer to the government's regulations. *Id.* at 810 (Stevens, J., dissenting).

As in *Davis*, which held that Justice Sotomayor's lone concurrence could not be the holding of *Freeman* under a reasoning-based approach to *Marks*, Justice Kennedy's lone concurrence— the reasoning of which was roundly rejected by all eight of the other Justices—cannot be the controlling opinion in *Rapanos*.

### (iii) The Ninth Circuit's Superseded Decision in *City of Healdsburg* Does Not Control the *Marks* Analysis of *Rapanos*

In arguing that Justice Kennedy's concurring opinion in *Rapanos* is binding on the Agencies in this rulemaking, *see* Motion for Preliminary Injunction at 21-24, *id.* at 39:13-18, ECF 30, California does not cite the Ninth Circuit's decision in *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007), that Justice Kennedy's concurrence is the holding of *Rapanos*. However, it is nevertheless worth noting here, that the subsequent intervening authority of *Davis* fatally undermines the results-based approach of *Healdsburg*, which is no longer precedent in the Ninth Circuit.

### (a) Any District Court in This Circuit Can Hold That *Davis* Fatally Undermines *Healdsburg*

District courts may reexamine circuit precedent in light of intervening en banc decisions of the Ninth Circuit. *Miller v. Gammie*, 335 F.3d 889, 892-93 (9th Cir. 2003) (en banc) (Supreme Court decisions); *Overstreet v. United Brotherhood of Carpenters and Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1205 n.8 (9th Cir. 2005) (citation omitted) (en banc Ninth Circuit decisions).

> We hold that . . . where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled.

*Miller v. Gammie*, 335 F.3d at 893. The issues decided by the higher court need not be identical to allow a district court to dispense with prior circuit authority. "Rather, the relevant court . . . must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id*. at 900.

In *Overstreet* the Ninth Circuit examined its prior holding in *Nelson v. Int'l Brotherhood of Elec. Workers, Local Union No. 46, AFL-CIO*, 899 F.2d 1557 (9th Cir. 1990) (NLRB entitled to injunction under Section 10(l) of the National Labor Relations Act under "reasonable cause" standard), and concluded that its subsequent en banc decision interpreting a different provision of the Act relating to injunctions, *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 (9th Cir. 1994) (en banc) (Section 10(j) of the Act requires the application of ordinary standards for issuance of injunctions), had overruled the prior panel decision in *Nelson* as to Section 10(l). *Overstreet*, 409 F.3d at 1204-05. In analyzing whether *Nelson*'s holding on Section 10(j) overruled *Miller*'s holding on Section 10(l), the Court focused on whether the reasoning of the two cases regarding the standard was consistent, and decided that the later en banc decision had undermined the reasoning of the earlier panel decision. *Overstreet*, 409 F.3d at 1205-06.

This Court must reassess *Healdsburg* under the en banc Ninth Circuit's holding in *Davis*, and should conclude that *Healdsburg* no longer controls, because the reasoning-based approach to *Marks*, as required by *Davis*, is clearly irreconcilable with and fatally undermines *Healdsburg*.

### (b) *Healdsburg* Uses the Now Forbidden Results-Based Approach

*Healdsburg* summarily concluded that the *Rapanos* concurrence controls, with little

discussion beyond a cursory citation to *Marks*: "Justice Kennedy, constituting the fifth vote for reversal, concurred only in the judgment" and, therefore, "provides the controlling rule of law." *Healdsburg*, 496 F.3d at 999-1000 (quoting *Marks*, 430 U.S. at 193). This is well short of the *Marks* analysis required by *Davis*. *See Davis*, 825 F.3d at 1024 (dismissing other circuit authorities that "engage with *Marks* only superficially, quoting its language with no analysis"). *Healdsburg* gives no reason why it adopted the concurrence other than to cite *United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006), itself a brief opinion concluding without substantive application of *Marks* that the concurrence controls.

Fatally for *Healdsburg*, it states that the "concurrence is the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases." 496 F.3d at 999. This is the results-based approach which *Davis* rejected. *Healdsburg* also relies on Justice Stevens' dissent in *Rapanos* to say that Justice Kennedy's concurrence is a narrower subset of the dissent. 496 F.3d at 999. But this is rejected by *Cardenas*. And *Cardenas*' rejection of dissents for *Marks* analysis, following *Davis*, is further demonstration that the Ninth Circuit has moved on from the cursory and results-oriented *Marks* analysis used in *Healdsburg*.

Also fatally, *Healdsburg* relies almost exclusively on the Seventh Circuit's decision in *Gerke*. That in turn explicitly uses the results-based approach in selecting the concurrence:

> Thus, any conclusion that Justice Kennedy reaches in favor of federal authority over wetlands in a future case will command the support of five Justices (himself plus the four dissenters), and in *most* cases in which he concludes that there is no federal authority he will command five votes (himself plus the four Justices in the *Rapanos* plurality)[.]

*Gerke*, 464 F.3d at 725 (emphasis in original).

*Healdsburg* is fatally undermined in two ways. It uses the results-based approach which *Davis* definitively rejects. And it uses the dissent as the broader opinion of which it concludes the

concurrence is the narrower subset, in violation of *Cardenas*. *See also Gibson v. American Cyanamid Co.*, 760 F.3d 600, 621 (7th Cir. 2014) (*Gerke* provides no authority for using dissenting opinions in *Marks* analysis). Under *Miller v. Gamie*, *Healdsburg* is no longer the law of this Circuit.

### 3. The Plurality Opinion Is the Holding of *Rapanos*, so the Injunction Should Extend to All Intermittent Streams and Non-abutting Wetlands

As demonstrated above, the plurality opinion in *Rapanos* is the holding of the case. So, the scope of the injunction issued pursuant to this motion should bar regulation of (i) all intermittent tributaries that would otherwise be regulated under Subsection 328.3(a)(3) and 328.3(c)(12), and (ii) all wetlands that do not directly abut other regulated water bodies, that would otherwise be regulated under Subsection 328.3(a)(4) and 328.3(c)(1)(ii)-(iv). Wetlands only "abut" if they have a direct physical interconnection with the water they abut such that it is difficult to establish where one begins and the other ends. *See Rapanos*, 547 U.S. at 739, 742 (limits to regulation of tributaries and adjacent wetlands).

#### a. If Justice Kennedy's Concurrence Is the Holding, Then the Injunction Should Extend to All Intermittent Tributaries and Non-abutting Wetlands Except Those Shown to Have a Significant Nexus

If the Court holds that Justice Kennedy's concurrence is the holding of *Rapanos*, then the Court should enjoin the enforcement of the challenged subsections to the extent they would regulate tributaries or wetlands for which EPA or the Army have not established, on a case-by-case basis, a significant nexus to a downstream navigable-in-fact river or lake. *Rapanos*, 547 U.S. at 780-81 (Kennedy, J., concurring) (specifying limits of authority to regulate tributaries and adjacent wetlands that lack a significant nexus).

### b. If *Marks* Cannot be Applied, Then the Injunction Should Extend to All Non-navigable Tributaries and Adjacent Wetlands

If the Court holds that *Marks* cannot be applied to *Rapanos*, as have the First, Third, and Eighth Circuits, then the Court should enjoin the regulation of any non-navigable tributaries, and any wetlands that do not abut navigable-in-fact lakes or rivers. *United States v. Johnson*, 467 F.3d 56, 64 (1st Cir. 2006), *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011), and *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009), all conclude that *Marks* cannot be applied. However, each of these decisions then errs in concluding that as a result the government can regulate water features that meet the criteria in either opinion. *Johnson*, 467 F.3d at 66; *Donovan*, 661 F.3d at 182; *Bailey*, 571 F.3d at 799.

This is an entirely erroneous application of *Marks*, and conflicts with the Tenth Circuit's controlling interpretation of *Marks*, that where it cannot be applied to a Supreme Court decision, the decision provides no rule of law to be applied. *United States v. Carrizales–Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006). In such cases, only the judgment in the case can be applied. *Large v. Fremont Cty.*, 670 F.3d 1133, 1141 (10th Cir. 2012). The judgment in *Rapanos* was to invalidate the tributary and adjacent wetlands subsections of the 1986 Regulations, and to remand to the Sixth Circuit to do its best without the regulations.

The plurality, to a degree, and the concurrence to a greater degree, each allow the regulation of some non-navigable tributaries and adjacent wetlands. But if neither opinion is the holding, then the only result of *Rapanos* is the judgment invalidating the regulation of tributaries and adjacent wetlands (except those covered by *Bayview Riverside Homes*). Absent a holding that allows regulation of some of these features, the judgment forecloses regulation of any of them. So if this Court holds that neither opinion is the holding, then it should enjoin the regulation of all non-navigable tributaries, and all wetlands that do not directly abut navigable-in-fact waters.

**B. Cattlemen Will Suffer Irreparable Harm Absent an Injunction, Because Their Injury Is Constitutional, and Because They Cannot Feasibly Obtain Army Permits on the Necessary Timetable and Cannot Recover the Costs of Obtaining Them**

"When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) (footnotes omitted). "[V]iolation of a constitutional right must weigh heavily in [the] analysis" of irreparable harm. *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). *Rapanos* states that the tributary and adjacent wetland subsections of the 1986 Regulations (which as shown above are identical in pertinent respects to the provisions of the 2020 Regulations which Cattlemen seeks to enjoin in this motion) violate the Commerce Clause and the Tenth Amendment. 547 U.S. at 738. No further proof of injury is necessary for an injunction to issue. *See Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cty.*, 893 F. Supp. 301, 309 (D.N.J. 1995) ("a violation of rights under the . . . Commerce Clause constitutes . . . 'irreparable harm'"); *Citicorp Services, Inc. v. Gillespie*, 712 F. Supp. 749, 753 (N.D. Cal. 1989) (Commerce Clause violation causes irreparable harm).

The Fourteenth Claim for Relief in Cattlemen's First Supplemental Complaint alleges that the Intermittent Tributary and Non-abutting Wetland Provisions violate the Tenth Amendment and the Commerce Clause. First Supplemental Complaint ¶¶ 162-76, at 44-47, ECF 90. The Supreme Court agrees. *Rapanos*, 547 U.S. at 730 (certiorari granted to determine constitutionality of Clean Water Act); *id*. at 738 (tributary provision of 1986 Regulations exceeds Commerce Power); *see also id*. at 782 (Kennedy, J., concurring) (significant nexus requirement prevents Act from exceeding constitutional limits).

The essence of these claims is that the Intermittent Tributary and Non-abutting Wetland Provisions exceed not only the scope of the Clean Water Act, but Congress' power to legislate

under the Tenth Amendment and the Commerce Clause. All Americans have the constitutional right to be free from Congressional and Executive Branch regulations that exceed the limited and enumerated powers of the federal government. This is no less true of the limits imposed by the Commerce Clause and Tenth Amendment than those imposed by the First, Fourth, Fifth, or Eighth Amendments. *New York v. United States*, 505 U.S. 144, 181 (1992) ("The Constitution divides authority between federal and state governments for the protection of individuals."); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 572 (1985) (Powell, J., dissenting) ("[B]y usurping functions traditionally performed by the States, federal overreaching under the Commerce Clause undermines the constitutionally mandated balance of power between the States and the Federal Government, a balance designed to protect our fundamental liberties.").

These established constitutional violations satisfy the criteria for irreparable harm for constitutional claims. *Fish v. Kobach*, 840 F.3d at 752.

Even without constitutional injury, application of the Intermittent Tributary and Non-abutting Wetland Provisions imminently and irreparably harms Cattlemen. The question here is not the severity of the harm, but whether it is actual or imminent, and irreparable. "[I]t is not so much the magnitude [of the harm] but the irreparability that counts for purposes of a preliminary injunction." *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974). The "alleged harm need not be occurring or be certain to occur" to grant a preliminary injunction. *Michigan v. United States Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

Many Cattlemen will be required to seek permits for projects that are not legally regulated under the Clean Water Act. Third Rosa Dec. ¶¶ 5-6, 13-15; Supp. Martin Dec. ¶ 3, ECF 46. In particular, intermittent tributaries and non-abutting "adjacent" waters are frequently found on

Cattlemen properties. Third Rosa Dec. ¶¶ 6-13; Supp. Martin Dec. ¶ 3, ECF 46. Because of the universal scope of these provisions, many Cattlemen will be required to either curtail operations or seek costly permits and suffer significant delays. Third Rosa Dec. ¶¶ 13-15; Supp. Martin Dec. ¶ 3, ECF 46. And, Cattlemen cannot recover the tens to hundreds of thousands of dollars in permitting expenses that the Provisions impose since "the United States has not waived sovereign immunity from suits seeking these sorts of damages." *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018).

In 2006 the Supreme Court invalidated the Tributary and Adjacent Wetland Subsections of the 1986 Regulations. *Rapanos*, 547 U.S. at 728; *id.* at 739 (Act does not authorize regulation of intermittent and ephemeral tributaries); *id.* at 755 (Act does not authorize regulation of wetlands that do not comingle with regulable tributaries); *id.* at 757 (remanding case for consideration under Supreme Court interpretation of the Act rather than regulations); *id.* at 759 (Kennedy, J., concurring) (issue is whether statute authorizes regulation of all non-navigable tributaries and non-abutting wetlands); *id.* at 781 (Kennedy, J., concurring) (regulation of all tributaries invalid under the Act); *id.* at 779 (Kennedy, J., concurring) (regulation asserting authority over all "neighboring" wetlands exceeds Act's requirement for significant nexus).

The Navigable Waters Protection Rule re-imposes identical portions of both of these illegal provisions on Cattlemen, requiring them to comply with federal limits on use of their own property to the extent of intermittent drainages and other water features.

The Declarations of Rosa and Martin show that Cattlemen properties commonly have intermittent drainages that are illegally and unconstitutionally regulated by the Intermittent Tributary and Non-abutting Wetland Provisions. Third Rosa Dec. ¶¶ 5-6, 13; Supp. Martin Dec. ¶ 3, ECF 46, demonstrate that their properties contain perennial and intermittent non-navigable

tributaries. And, these types of water features are common on Cattlemen property throughout Oregon. Third Rosa Dec. ¶¶ 5-6.

With the frequent presence of intermittent drainages and other temporary water features on their land, Cattlemen will either have to forego plowing and other earth moving operations in and around these features, or obtain prohibitively expensive permits to eventually proceed (after multi-year waits) with those operations. If they proceed with their operations without permits, they face crippling liability.

To avoid this liability, it would be necessary for Cattlemen to seek advance determinations from the Army whether their operations are exempt under 33 C.F.R. §320.1(a)(6). This determination is itself time-consuming and costly. *See Duarte Nursery v. Army Corps*, E.D. Cal. case no. 2:13-cv-02095-KJM, Deposition of James Robb, ECF 113, at 66:9–75:11 (establishing exemption requires jurisdictional delineation and detailed explanation of farming history), Exhibit A to François Decl. So the exemption cannot be confirmed without the time and expense of the jurisdictional determination that the exemption would in theory make unnecessary.

These harms are ongoing or imminent. The Provisions will take effect on June 22, 2020. 85 Fed. Reg. 22,250. Because permitting takes more than two years on average, Cattlemen will be unable to legally engage in any earth moving operations on their own property wherever they encounter intermittent drainages and other temporary water features for at least two years. This includes any non-exempt plowing during the next two years, as well erosion control and prevention, sediment trapping, and even environmental enhancement projects. Many of these operations may be urgently required on an unpredictable basis due to weather and other factors. *See Oregon Cattlemen's Association v. EPA*, D. Or. Case No. 3:19-cv-00564-AC; Transcript of July 17, 2019, Bench Ruling Granting Motion for Preliminary Injunction, at 37:7–38:13 (illegal

regulation of tributaries by 2015 Regulations, where "circumstances can change rapidly," is imminent and irreparable harm to Cattlemen); Exhibit B to François Decl.; *cf. Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehabilitation Services*, 31 F.3d 1536, 1543 (10th Cir. 1994) (trade association showed irreparable harm when no remedy available to redress illegal regulations).

Cattlemen will suffer costs, delays, and inability to use their own land, for which no money damages or other remedy is available, and which are ongoing or imminently planned or necessary within the two-year time frame for permitting, especially considering the unpredictability of weather conditions that may require prompt action. Cattlemen face ongoing or imminent irreparable injury as a result of the Tributary and Adjacent Wetland Subsections.

### C.    The Balance of Equities and the Public Interest Both Favor an Injunction

A plaintiff seeking a preliminary injunction must show that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. In this case, the risk of harm of granting a preliminary injunction is low. The Intermittent Tributary and Non-abutting Wetland Provisions are indistinguishable from the corresponding provisions of the 1986 Regulations that were already ruled illegal by the Supreme Court in 2006. And this Court previously enjoined the 2015 Regulations, which also regulated intermittent tributaries and non-abutting wetlands. Furthermore, "[t]he Government 'cannot suffer harm from an injunction that merely ends an unlawful practice'" as would an injunction here. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Furthermore, "enforcing the APA strictly [would better] serve the public interest." *Texas Food Indus. Ass'n v. U.S. Dep't of Agriculture*, 842 F. Supp. 254, 261 (W.D. Tex. 1993); *accord N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). On the other

hand, without an injunction "the states, their governmental subdivisions, and their citizens" will be asked "to expend valuable resources and time operationalizing a rule that may not survive judicial review." *Texas v. United States Environmental Protection Agency*, No. 3:15-CV-00162, 2018 WL 4518230, at *1 (S.D. Tex. Sept. 12, 2018); *accord Georgia v. Pruitt*, 326 F. Supp. 3d at 1370 ("[I]f the [2015 Navigable Waters Definition] becomes effective before a final decision on the merits is rendered, farmers, homeowners, and small businesses will need to devote time and expense to obtaining federal permits—all to comply with a rule that is likely to be invalidated."). None of that is in the public interest.

## CONCLUSION

The Court should rule that the *Rapanos* plurality is the controlling rule of law and grant the requested preliminary injunction.

DATED: June 8, 2020.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

By /s/ Christina M. Martin

ANTHONY L. FRANÇOIS*          CHRISTINA M. MARTIN, OSB #084117
Cal. Bar #184100               4440 PGA Blvd., Suite 307
DANIEL M. ORTNER*              Palm Beach Gardens, Florida 33410
Va. Bar #89460                 Telephone: (561) 691-5000
*(pro hac vice)                cmartin@pacificlegal.org
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
tfrancois@pacificlegal.org
dortner@pacificlegal.org

*Attorneys for Plaintiff Oregon Cattlemen's Association*