JAMES NEVILLE SAUL (OSB #152809)
jsaul@lclark.edu
Earthrise Law Center
10015 S.W. Terwilliger Boulevard
Portland, OR 97219
(503) 768-6929 | Phone
(503) 768-6642 | Fax

JANETTE K. BRIMMER (WSB #41271)
jbrimmer@earthjustice.org
[Appearing *Pro Hac Vice*]
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax

ANNA M. SEWELL (WSBA #48736)
asewell@earthjustice.org
[Appearing *Pro Hac Vice*]
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500 | Phone
(202) 667-2356 | Fax
*Attorneys for Defendant-Intervenor Columbia Riverkeeper*

HONORABLE MICHAEL MOSMAN

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

OREGON CATTLEMEN'S ASSOCIATION,
                         Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; ANDREW
WHEELER, in his official capacity as
Administrator of the Environmental Protection

Case No. 3:19-cv-00564-AC

DEFENDANT-INTERVENOR'S
RESPONSE IN OPPOSITION TO
PLAINTIFF'S SECOND MOTION FOR
PRELIMINARY INJUNCTION

Agency; UNITED STATES ARMY CORPS OF
ENGINEERS, and R.D. JAMES, in his official
capacity as Assistant Secretary for Civil Works,
Department of the Army,

                      Defendants,

   And

COLUMBIA RIVERKEEPER,

                      Intervenor-
                      Defendant.

_____

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

   I.    CLEAN WATER ACT ................................................................................... 2

   II.   SUPREME COURT CASES ......................................................................... 3

   III.  CLEAN WATER RULE ................................................................................ 5

   IV.  NAVIGABLE WATERS RULE .................................................................... 9

   V.   CATTLEMEN'S MOTION FOR PRELIMINARY INJUNCTION ................................ 11

STANDARD OF REVIEW .................................................................................................. 12

ARGUMENT ..................................................................................................................... 13

   I.    CATTLEMEN ARE NOT LIKELY TO SUCCEED ON THE MERITS. ....................... 13

      A.  The Clean Water Act and its Legislative History Support the Broad Protection
of the Nation's Waters. ................................................................................................. 13

          1.    Congress Passed The Clean Water Act Because States Had Failed To
Adequately Protect Waters. ........................................................................ 14

          2.    Congress Intended to Broadly Protect all "Waters of the United States.".... 14

      B.  Justice Scalia's Plurality Opinion is not the Controlling Rule from *Rapanos*............ 15

      C.  The Agencies have the Authority to Protect the Challenged Waters Under Either
Justice Kennedy's Opinion or Justice Scalia's Opinion from *Rapanos*. .......................... 20

          1.    Justice Scalia Plurality ................................................................................ 20

          2.    Justice Kennedy Concurrence ..................................................................... 21

   II.   CATTLEMEN FAIL TO SHOW HARM, MUCH LESS IRREPARABLE HARM,
FROM THE CHALLENGED PROVISIONS. ................................................................. 23

      A.  Cattlemen Have Not Demonstrated the Challenged Provisions Will Cause Any
Harm. ............................................................................................................................ 24

      B.  Cattlemen Will Not Suffer Irreparable Constitutional Harm....................................... 25

   III.  THE BALANCE OF HARMS AND PUBLIC INTEREST TIP SHARPLY IN FAVOR
OF DENYING THE REQUEST FOR INJUNCTIVE RELIEF.......................................... 27

      A.  The Harms Caused by the Unpermitted Pollution and Destruction of the Challenged
Waters Would be Significant. ........................................................................................ 27

      B.  The Preliminary Injunction is not in the Public's Interest Because the Public Interest
is in Protecting Public Water Resources. ..................................................................... 30

CONCLUSION .................................................................................................................. 31

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*All. for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ........................................................................12, 23

*Am. Paper Inst., Inc. v. EPA*,
 890 F.2d 869 (7th Cir. 1989) ................................................................................14

*Anderson v. U.S.*,
 612 F.2d 1112 (9th Cir. 1979) ..............................................................................12

*Assoc. Gen'l Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
 950 F.2d 1401 (9th Cir. 1991) ..............................................................................27

*Boardman v. Pacific Seafood Grp.*,
 822 F.3d 1011 (9th Cir. 2016) ..............................................................................23

*County of Maui, Hawaii v. Hawaii Wildlife Fund*,
 140 S. Ct. 1462 (2020) ....................................................................................19, 20

*EPA v. California ex rel. St. Water Resources Control Bd.*,
 426 U.S. 200 (1976) ..............................................................................................14

*Garcia v. Google, Inc.*,
 786 F.3d 733 (9th Cir. 2015) ..........................................................................12, 25

*Goldie's Bookstore, Inc. v. Superior Ct. of St. of Cal.*,
 739 F.2d 466 (9th Cir. 1984) ..........................................................................23, 25

*Idaho Conserv. League v. Atlanta Gold Corp.*,
 879 F. Supp. 2d 1148 (D. Id. 2012) ......................................................................31

*Int'l Paper Co. v. Ouellette*,
 479 U.S. 481 (1987) ................................................................................................3

*Lopez v. Brewer*,
 680 F.3d 1068 (9th Cir. 2012) ..............................................................................12

*Lydo Enters., Inc. v. City of Las Vegas*,
 745 F.2d 1211 (9th Cir. 1984) ..............................................................................25

*Marks v. United States*,
 430 U.S. 188 (1977) ..............................................................................................16

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-ii-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)................................................................................12

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018)..............................................................................19

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)................................................................................26

*Northern Cal. River Watch v. City of Healdsburg,*
    496 F.3d 993 (9th Cir. 2007) ..................................................................16

*Oakland Tribune, Inc. v. Chronicle Publishing Co.,*
    762 F.2d 1374 (9th Cir. 1985) ................................................................25

*Oregon State Public Interest Res. Grp. v. Pacific Coast Seafoods Co.,*
    374 F. Supp. 2d 902 (D. Or. 2005) .........................................................31

*PPL Montana, LLC v. Montana,*
    565 U.S. 576 (2012)..........................................................................19, 26

*Precon Dev. Corp., Inc. v. U.S. Army Corps of Engineers,*
    633 F.3d 278 (4th Cir. 2011) ..................................................................19

*Puget Soundkeeper Alliance v. Wheeler,*
    2018 WL 6169196 (W.D. Wash. 2018) ....................................................9

*Rapanos v. United States,*
    547 U.S. 715 (2006)........................................................................ *passim*

*S.C. Coastal Conservation League v. Pruitt,*
    318 F. Supp. 3d 959 (D.S.C. 2018).........................................................9

*Sackett v. EPA,*
    566 U.S. 120 (2012)................................................................................19

*San Francisco Baykeeper v. Cargill Salt Div.,*
    481 F.3d 700 (9th Cir. 2007) ............................................................16, 17

*Sierra Forest Legacy v. Rey,*
    577 F.3d 1015 (9th Cir. 2009) ................................................................27

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,*
    531 U.S. 159 (2001)..............................................................................3, 4

*Southeast Alaska Conserv. Council v. U.S. Army Corps of Engineers,*
    472 F.3d 1097 (9th Cir. 2006) ................................................................31

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

*Stanley v. University of Southern California*,
  13 F.3d 1313 (9th Cir. 1994) ...........................................................................12

*U.S. Army Corps of Engineers v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) .....................................................................................19

*United States v. Ashland Oil & Transp. Co.*,
  504 F.2d 1317 (6th Cir. 1974) .........................................................................26

*United States v. Bailey*,
  571 F.3d 791 (8th Cir. 2009) ...........................................................................18

*United States v. Clark*,
  617 F.2d 180 (9th Cir. 1980) ...........................................................................17

*United States v. Cundiff*,
  555 F.3d 200 (6th Cir. 2009) ...........................................................................18

*United States v. Davis*,
  825 F.3d 1014 (9th Cir. 2016) (en banc) ....................................................16, 17

*United States v. Donovan*,
  661 F.3d 174 (3d Cir. 2011)...........................................................................18, 19

*United States v. Gerke*,
  464 F.3d 723 (7th Cir. 2006) ...........................................................................18

*United States v. Johnson*,
  467 F.3d 56 (1st Cir. 2006)...............................................................................18

*United States. v. Lucas*,
  516 F.3d 316 (5th Cir. 2008) .........................................................................18, 19

*United States v. Moses*,
  496 F.3d 984 (9th Cir. 2007) ........................................................................16, 17

*United States v. Riverside Bayview Homes, Inc.*,
  474 U.S. 121 (1985).............................................................................................3

*United States v. Robertson*,
  875 F.3d 1281 (9th Cir. 2017), *cert. granted, judgment vacated on other
  grounds*, 139 S. Ct. 1543 (2019).......................................................................17

*United States v. Robison*,
  505 F.3d 1208 (11th Cir. 2007) .......................................................................18, 19

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

*Utah v. United States*,
    403 U.S. 9 (1971) ............................................................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................12, 13, 23, 27


**STATUTES**

33 U.S.C. §§ 1251-388 ...........................................................................................................5

33 U.S.C. § 1251 ....................................................................................................................2

33 U.S.C. § 1251(a) ...........................................................................................................2, 14

33 U.S.C. § 1311(a) ............................................................................................................28

33 U.S.C. § 1321 ....................................................................................................................2

33 U.S.C. § 1342 .............................................................................................................2, 28

33 U.S.C. § 1344 ....................................................................................................................2

33 U.S.C. § 1344(a) ............................................................................................................28

33 U.S.C. § 1362(7) .........................................................................................................2, 14


**FEDERAL REGISTER NOTICES**

44 Fed. Reg. 32,854 (June 7, 1979) ..............................................................................2, 11, 24

79 Fed. Reg. 22,188 (Apr. 21, 2014) .................................................................................6, 7

80 Fed. Reg. 37,054 (June 29, 2015) .......................................................................... *passim*

82 Fed. Reg. 12,532 (Mar. 6, 2017) ....................................................................................9

82 Fed. Reg. 34,899 (July 27, 2017) ...................................................................................9

82 Fed. Reg. 55,542 (Nov. 22, 2017) ..................................................................................9

83 Fed. Reg. 5200 (Feb. 6, 2018) ........................................................................................9

84 Fed. Reg. 56,626 (Oct. 22, 2019) ...................................................................................9

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
                                    -v-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

84 Fed. Reg. 4154 (Feb. 14, 2019) ................................................................................9

85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................................................... *passim*

**OTHER SOURCES**

CONG. RESEARCH SERV., A LEGISLATIVE HISTORY OF THE WATER POLLUTION
    CONTROL ACT AMENDMENTS OF 1972, Senate Consideration of the Rpt. of
    the Conference Committee (Oct. 4, 1972) ......................................................14, 15

James Salzman & Barton H. Thompson, Jr., Envtl. L. and Pol'y 141 (2d ed. 2007) ...................14

Robert L. Glicksman & Matthew R. Batzel, *Science, Politics, Law, and the Arc of
    the Clean Water Act*, 32 Wash. U. J. L. & Pol'y 099 (2010)....................................14

S. Rep. No. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668................................3, 4, 14, 15

U.S. Const., art. I, § 8....................................................................................................26

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

INTRODUCTION

The rule challenged by Plaintiff Oregon Cattlemen's Association ("Cattlemen") in this case dramatically limits protections afforded by the Clean Water Act, stripping the Act's coverage from vast numbers of waters that have been protected for decades. Cattlemen now seek to restrict the Act's reach even further, asking this Court to take the extraordinary step of editing the new rule to remove protections for all tributaries that do not "flow[] continuously year round" and all wetlands that do not directly "abut" other protected waters on the surface. Pl.'s Second Mot. for Prelim. Inj. ("Mot") 7-8, ECF No. 97.

Cattlemen do not satisfy any of the four factors necessary for preliminary injunctive relief, much less the heightened standard necessary for the mandatory injunctive relief sought here. First, Cattlemen's claims are meritless. The claims are unsupported by the Supreme Court and the courts of appeals, and are in conflict with the Clean Water Act's broad mandate to restore and protect the nation's waters. Cattlemen also have not met the equitable requirements for a preliminary injunction. Preserving the U.S. Environmental Protection Agency's ("EPA") and U.S. Army Corps of Engineers' ("Corps") (collectively, the "Agencies") pre-existing practice of protecting the challenged waters under the Clean Water Act for the pendency of this litigation would not cause the Cattlemen or its members harm, much less imminent, irreparable harm. By contrast, the requested injunction would strip protections from waters that serve critical public interests and ecological functions and that have generally been subject to Clean Water Act coverage for more than forty years.

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

BACKGROUND

I.    CLEAN WATER ACT

The Clean Water Act ("CWA" or the "Act") is the primary federal law governing water pollution in the United States. Its purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The scope of the CWA's coverage determines which waters are protected by the Act's programs and which are not. The CWA itself provides that its jurisdiction extends to "navigable waters," which Congress broadly defined as "the waters of the United States, including the territorial seas." *See id.* §§ 1251, 1321, 1342, 1344; *see also id*. § 1362(7).

In carrying out Congress' mandate, for nearly three decades, the Agencies have implemented the CWA to broadly protect the nation's waters, including tributaries and wetlands. Prior to the promulgation of the 2015 Clean Water Rule, the core provisions of the regulatory definition for "waters of the United States" had remained largely unchanged since 1979, defining the term to include, among other things:

> (1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (2) Interstate waters, including interstate wetlands; (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats and wetlands the use, degradation or destruction of which would affect or could affect interstate or foreign commerce . . . ; (4) All impoundments of waters otherwise defined as navigable waters under this paragraph; (5) Tributaries of waters identified in paragraphs (1)-(4) of this section, including adjacent wetlands; and (6) Wetlands adjacent to waters identified in paragraphs (1)-(5) of this section.

National Pollutant Discharge Elimination System; Revision of Regulations, 44 Fed. Reg. 32,854, 32,901 (June 7, 1979).

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-2-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

II.    SUPREME COURT CASES

The Supreme Court has long recognized that the Act's protective reach must be broadly interpreted in order to ensure the purpose of restoring and maintaining the biological, physical, and chemical integrity of our Nation's waters is fulfilled. For example, in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985), the Supreme Court specifically noted "the Act's definition of 'navigable waters' as 'the waters of the United States' makes it clear that the term 'navigable' as used in the Act is of limited import" because "Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes . . . ." *Id*. at 133. The Court "recognize[d] that Congress intended to allow regulation of waters that might not satisfy traditional tests of navigability . . ." *Id*. at 133; *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 486 n.6 (1987) (noting that "navigable waters" has been "construed expansively to cover waters that are not navigable in the traditional sense"). In *Riverside Bayview*, the Court ultimately upheld the Act's application to wetlands adjacent to traditional navigable waters, observing that the Act incorporates a "broad, systemic view of the goal of maintaining and improving water quality." *Riverside Bayview Homes, Inc.*, 474 U.S. at 132. The Court held the Act provides federal authority to regulate discharges into both traditional navigable waters and wetlands adjacent to such waters. *Id.* at 131, 135. The Court explained that in light of the "breadth of federal regulatory authority contemplated by the Act," and the difficulty of line-drawing in this context, the Corps' ecological judgment that wetlands have significant impacts on water quality and biological functions in adjacent waterways was sufficient to deem such wetlands covered by the Act. *Id.* at 134. The Court also noted Congress's determination that "[p]rotection of aquatic ecosystems … demanded broad federal authority to control pollution, for '[w]ater moves in hydrologic cycles and it is essential that discharge of

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-3-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

pollutants be controlled at the source.'" *Id.* at 132-33 (quoting S. Rep. No. 92-414 at 77 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3742).

The Court later reiterated the importance of a waterway's impacts on downstream waters when examining the Act's scope in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159 (2001). In that case, the Court ruled that the Agencies' "Migratory Bird Rule" could not be used to extend the reach of the Act to an abandoned sand and gravel pit. *Id.* at 162, 164. In the opinion, the Court distinguished the wetlands at issue in *Riverside Bayview* from the sand and gravel pit at issue in *SWANCC* because the gravel pit lacked the "significant nexus" that *Riverside Bayview* wetlands had with traditional navigable waters. *See id.* at 167-68 (noting: "It was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in *Riverside Bayview Homes.*"). However, the Court did not invalidate any portion of the federal regulations; it held only that the regulations, "as clarified and applied to petitioner's balefill site" under the Migratory Bird Rule, exceeded the Corps' authority. *Id.* at 174.

Finally, in *Rapanos v. United States*, 547 U.S. 715 (2006), the Court issued a fractured opinion with no majority. A four-Justice plurality authored by Justice Scalia proposed one test for determining whether a particular feature is a "water of the United States;" Justice Kennedy, concurring in the judgment, proposed another, commonly referred to as the "significant nexus" test; and four dissenting Justices would have left the Agencies' definition in place, but also said they would uphold protection for waters satisfying *either* Justice Scalia's or Justice Kennedy's test. *Id.* at 810 (Stevens, J., dissenting). Justice Kennedy's "significant nexus" test would protect wetlands with a significant nexus to waters traditionally considered navigable. *Id.* at 759, 787. Such nexus exists where wetlands or other waters, "either alone or in combination with similarly

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-4-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780. Justice Scalia took a much more restrictive view of the CWA, applying its protections only to "relatively permanent" waters. *Id*. at 732. The Court remanded, for further review, the Corps' application of the Act to four wetlands "lying near ditches or man-made drains that eventually empty into traditional navigable waters." *Id.* at 715.

III.    CLEAN WATER RULE

In 2015, the Agencies published the "Clean Water Rule," which defined the term "waters of the United States" under the CWA. 80 Fed. Reg. 37,054 (June 29, 2015). The rule, based upon Justice Kennedy's "significant nexus" test in *Rapanos*, was the first revision to regulations interpreting "waters of the United States" in more than thirty years. 33 U.S.C. §§ 1251-388; 80 Fed. Reg. at 37,073-74. The Clean Water Rule identified three basic categories of waters: (1) waters categorically protected under the CWA in all instances; (2) waters protected under the CWA on a case-by-case showing of significant nexus; and (3) waters categorically excluded from protection. The rule also contained various provisions that, for the first time, adopted standardized definitions for key terms such as "tributary" and "adjacent." 80 Fed. Reg. at 37,075-86. Waters within these categories had historically been subject to jurisdiction under the CWA and relevant case law, based on requirements in the CWA and case-specific jurisdictional analyses by the Agencies demonstrating a "significant nexus" to an interstate water, traditional navigable water, or territorial sea. *See id.* at 37,056.

As the scientific foundation for the Clean Water Rule, the Agencies relied on a published "synthesis of published peer-reviewed scientific literature discussing the nature of connectivity and effects of streams and wetlands on downstream waters," prepared by EPA's Office of

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-5-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

Research and Development, entitled "Connectivity of Streams and Wetlands to Downstream

Waters: A Review and Synthesis of the Scientific Evidence" (2015) ("Science Report"), ECF

No. 38-2. 79 Fed. Reg. 22,188, 22,189 (Apr. 21, 2014). In preparing the Science Report and the

rule, EPA reviewed more than 1,200 peer-reviewed scientific papers as well as other data and

information, including jurisdictional determinations, relevant agency guidance and

implementation manuals, and federal and state reports that addressed connectivity of aquatic

resources. The Science Report documented the extensive evidence demonstrating that tributaries

and wetlands play critical roles in maintaining the physical, chemical, and biological integrity of

downstream waters.

   Based on the evidence that was included in the Science Report, the Clean Water Rule

confirmed that the following waters should be categorically protected under the CWA in all

instances:  "(i) All waters which are currently used, were used in the past, or may be susceptible

to use in interstate or foreign commerce, including all waters which are subject to the ebb and

flow of the tide; (ii) All interstate waters, including interstate wetlands; (iii) The territorial seas;

(iv) All impoundments of waters otherwise identified as waters of the United States under . . .

[the rule]; (v) All tributaries . . . of waters identified in . . . [the preceding sections of the rule];

[and] (vi) All waters adjacent to a water identified in . . . [the preceding sections of the rule],

including wetlands, ponds, lakes, oxbows, impoundments, and similar waters." 80 Fed. Reg. at

37,114.[1]

---

[1] The Clean Water Rule also contained provisions categorically deeming certain waters "not
jurisdictional"—meaning not protected under the CWA—including certain "waste treatment
systems," "prior converted cropland," and water transfers. *Id*. at 37,073.

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

The Science Report found unequivocal consensus evidence that all tributaries—including

perennial, intermittent, and ephemeral streams—"exert a strong influence on the integrity of

downstream waters," and that all tributaries have a significant nexus to navigable-in-fact waters,

interstate waters, and the territorial sea. Science Report at ES-2. One reason tributaries are so

important to downstream waters is that, to a large degree, tributaries determine the characters of

the water downstream—physically, chemically, and biologically. *Id.* at 3-45 to 3-46. Tributaries

supply initial flow to downstream waters like rivers, as well as the materials that form a river's

bed and banks, such as sediment, and the materials that fill it, such as water, nutrients, and

organisms. *See, e.g.*, *id.* at 3-47 tbl.3-1, 4-40 tbl.4-3. In some cases, they do this by filtering or

settling out, or delaying the delivery of, other materials like contaminants or floodwaters. *Id.* at

3-47 tbl.3-1, 4-40 tbl.4-3. Tributaries can also serve as nurseries or spawning areas during certain

times of the year for species that then migrate downstream later in their life stages, for example,

as part of migrating salmon lifecycles on both coasts. *See, e.g.*, *id.* at ES-5, ES-13, 1-9, 2-40, and

2-44. Based on the findings of the Science Report and the Agencies, the Clean Water Rule

categorically protected all tributaries and defined the term "tributary" as "a water that contributes

flow, either directly or through another water[,]" to traditional navigable waters, interstate

waters, or the territorial seas, and that "is characterized by the presence of the physical indicators

of a bed and banks and an ordinary high water mark." 79 Fed. Reg. at 22,189, 22,199; 80 Fed.

Reg. at 37,058-59, 37,065, 37,115.

The Science Report also found clear evidence that wetlands and open waters in

floodplains are "highly connected" to tributaries and rivers "through surface water, shallow

ground water, and biological connectivity." Science Report at ES-2, 4-1, 4-39. The report found,

too, that wetlands and open waters located outside of floodplains serve numerous functions such

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-7-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

as floodwater storage, intercepting contaminants and filtering them through the roots of wetland

plants, replenishing water supplies, or biological functions for species dependent upon certain

hydrologic ecosystems, all benefitting downstream water integrity. *Id*. at ES-3, 4-20, 4-38, 4-11,

4-14. Based on the Science Report, the Agencies concluded that wetlands and waters in

floodplains should be categorically protected, and they broadly defined "adjacent wetlands" to

include those "bordering, contiguous, or neighboring a water [otherwise protected under the

regulation], including waters separated by constructed dikes or barriers, natural river berms,

beach dunes, and the like." 80 Fed. Reg. at 37,058, 37,105.

Based upon the findings in the Science Report, the Agencies also found that certain

categories of waters should be protected on a case-by-case basis when necessary to protect the

physical, chemical, or biological integrity of downstream waters and to serve the objectives of

the Act. The first category of waters eligible for case-specific determinations under the Clean

Water Rule included enumerated, ecologically specific types of wetlands—namely, prairie

potholes, Carolina and Delmarva bays, pocosins, Western vernal pools, and Texas coastal prairie

wetlands—that were considered ecologically similarly situated and combined within a watershed

for the purposes of determining a significant nexus. 80 Fed. Reg. at 37,114. Such waters would

meet the definition of "waters of the United States" under the rule if they were "determined, on a

case-specific basis, to have a significant nexus to a water" otherwise protected under the rule. *Id*.

The second category of waters eligible for a case-specific determination included "waters located

within the 100-year floodplain of . . . [another protected] water . . . and all waters located within

4,000 feet of the high tide line or ordinary high water mark of . . . [another protected] water . . .

where they are determined on a case-specific basis to have a significant nexus to [such] a

water[.]" *See, e.g.*, *id*.

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

IV.    NAVIGABLE WATERS RULE

Under the current administration, the Agencies have abandoned the Clean Water Rule and sought to replace it with a rule that substantially narrows the scope of the "waters of the United States" that are protected under the CWA. On March 6, 2017, the Agencies announced their intent to review, rescind, and revise the Clean Water Rule in a notice published in the Federal Register. *See* Intention to Review and Rescind or Revise the Clean Water Rule, 82 Fed. Reg. 12,532 (March 6, 2017). On July 27, 2017, the Agencies proposed to repeal the Clean Water Rule and recodify the previous regulatory definition of "waters of the United States." *See* Definition of "Waters of the United States"—Recodification of Pre-existing Rules, 82 Fed. Reg. 34,899 (July 27, 2017). On November 22, 2017, the Agencies proposed to add an "applicability date" to the Clean Water Rule, delaying the rule for a period of two years. *See* Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 82 Fed. Reg. 55,542 (Nov. 22, 2017). The applicability-date rule was finalized on February 6, 2018, 83 Fed. Reg. 5200, but an August 2018 order from the U.S. District Court for the District of South Carolina and a November 2018 order from the U.S. District Court for the Western District of Washington vacated that rule nationwide. *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959 (D.S.C. 2018); *Puget Soundkeeper Alliance v. Wheeler*, 2018 WL 6169196 (W.D. Wash. 2018). The Agencies published their final repeal rule on October 22, 2019, and it took effect on December 23, 2019. *See* Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019). Finally, on February 14, 2019, the Agencies proposed a completely new definition of "waters of the U.S." that would severely curtail the scope of the CWA. *See* Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (Feb. 14, 2019).

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-9-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

The Agencies published the final replacement regulation, called the "Navigable Waters Protection Rule," on April 21, 2020, with an effective date of June 22, 2020. *See* The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250, 22,338-39 (Apr. 21, 2020) ("Navigable Waters Rule"). The Navigable Waters Rule redefines the waters that are protected by the CWA, limiting them to: (i) the territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use, in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide; (ii) tributaries; (iii) lakes and ponds, and impoundments of jurisdictional waters; and (iv) adjacent wetlands. *Id.* at 22,338. The definition categorically excludes interstate waters from protection for the first time in the Act's history. *Id.* at 22,282–22,286. The rule defines waters that are categorically not protected by the CWA as (i) waters or water features that are not specifically identified in the rule as categorically jurisdictional; (ii) groundwater, including groundwater drained through subsurface drainage systems; (iii) "ephemeral" features, including ephemeral streams, swales, gullies, rills, and pools; (iv) diffuse stormwater run-off and directional sheet flow over uplands; (v) ditches that are not waters identified elsewhere in the definition; and (xii) waste treatment systems, among other waters. *Id.* at 22,338. The rule also has no provision for case-by-case jurisdictional determinations, meaning that waters not expressly identified as protected will be excluded from protection, even if they have a significant nexus to other waters protected under the Act.

The Navigable Waters Rule additionally limits protections under the Act by substantially narrowing the definition of tributaries and providing new definitions of "ephemeral" and "intermittent" tributaries. Citing Justice Scalia's plurality opinion in *Rapanos* for support, the regulation narrows the definition of "tributaries" to exclude all waters that are considered

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

"ephemeral," meaning waters that flow "only in direct response to precipitation" in a typical

year. *Id*. at 22,338-39. The rule only protects tributaries that are "perennial or intermittent in a

typical year." *Id*. at 22,339. Intermittent tributaries are defined to mean "surface water flowing

continuously during certain times of the year and more than in direct response to precipitation

(e.g., seasonally when the groundwater table is elevated or when snowpack melts)." *Id*. at

22,338.

The rule also narrows the definition of wetlands that are "waters of the United States,"

generally limiting protected wetlands to those that directly abut, on the surface and on at least

one point or side, another protected water. *Id*. The rule maintains protections for other wetlands

that are connected to protected waters under only three circumstances. First, connected wetlands

that are separated from a protected water by only a "natural berm, bank, dune or similar natural

feature" remain protected. *Id*. Second, wetlands that are separated from a protected water only by

an "artificial dike, barrier, or similar artificial structure" may be protected, but only if the barrier

allows for a direct surface-water connection to the protected water in a typical year through a

culvert, flood or tide gate, or pump. *Id*. at 22,338. Finally, wetlands that are inundated by

flooding by a protected water are protected, but only if that flooding occurs in a "typical year."

*Id*. The rule's restrictions will result in important wetlands losing long-guaranteed CWA

protections.

V.    CATTLEMEN'S MOTION FOR PRELIMINARY INJUNCTION

In promulgating the Navigable Waters Rule, the Agencies have unlawfully narrowed the

tributary and wetlands protections that have been in place for decades, rather than impose new

permitting requirements for these waters. *See* 44 Fed. Reg. at 32,901 (1979 regulations noting the

protection of tributaries and adjacent wetlands). Yet, Cattlemen challenge coverage for many of

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

the types of tributaries and wetlands that retained their long-standing protections in this rule,

seeking to even further constrict the scope of federal protections. Mot. 8. Specifically, Cattlemen

seek to enjoin the portion of the tributary definition that protects "intermittent" tributaries, as

well as the portion of the wetlands definition that protects wetlands that are connected to other

protected waters but separated by only natural features, or that have a surface connection to other

protected waters in a typical year through an artificial feature or via floodwaters (hereinafter the

"challenged waters"). *Id*.

STANDARD OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be

granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v.

Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.

Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these factors, moreover, must be

supported by a "clear showing." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35

(9th Cir. 2011); *Mazurek*, 520 U.S. at 972.

Because Cattlemen do not request maintenance of the status quo and instead seek to

essentially rewrite the Navigable Waters Rule, they seek a mandatory injunction—a form of

relief that is "particularly disfavored." *Stanley v. University of Southern California*, 13 F.3d

1313, 1320 (9th Cir. 1994) (quoting *Anderson v. U.S.*, 612 F.2d 1112, 1114 (9th Cir. 1979)). The

preliminary injunction standard is further heightened when the type of injunction sought is a

mandatory one. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-12-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor*" its position, not simply that it is "likely to succeed." *Id.*

ARGUMENT

Cattlemen fail to demonstrate a likelihood of success on the merits or irreparable harm, or to show that the balance of equities or public interest tip sharply in its favor.

## I.    CATTLEMEN ARE NOT LIKELY TO SUCCEED ON THE MERITS.

The first factor plaintiffs must fulfill in order to obtain a preliminary injunction is a demonstration of a likelihood of success on the merits. *Winter*, 555 U.S. at 20. In order to succeed on the merits here, Cattlemen must demonstrate that the Navigable Waters Rule's limited protections for the challenged waters are contrary to law.[2] Cattlemen have made no such showing. The provisions that Cattlemen seek to enjoin are amply supported by the plain text of the CWA and its legislative history, as well as Supreme Court precedent and decisions from the courts of appeals.

### A.    The Clean Water Act and its Legislative History Support the Broad Protection of the Nation's Waters.

The Agencies' severe narrowing of the term "waters of the United States" in the Navigable Waters Rule is not supported by the text and legislative history of the CWA, and

---

[2] In a comment letter on the proposed Navigable Waters Rule submitted by the National Cattlemen's Beef Association (joined by the Oregon Cattlemen Association), Cattlemen took a different position. Cattlemen did not make any arguments that the challenged provisions are unlawful, and instead simply sought clarification of some aspects of the definitions. *See* Public Comments of the Nat'l Cattlemen's Beef Ass'n at 8–9 (urging the Agencies to "clarify" and "strengthen[]" the intermittent tributary definition), 13–14 (stating that the wetlands definitions comply with Supreme Court precedent and urging the Agencies to clarify some aspects of the definitions), *available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-4673.

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

Cattlemen's attempt to further restrict the scope of the CWA is similarly at odds with Congress'
intent to broadly protect the Nation's waters.

1.      *Congress Passed The Clean Water Act Because States Had Failed To*
        *Adequately Protect Waters.*

The CWA was the culmination of years of failed efforts by states to protect and clean up
the Nation's waters through the implementation of state-based water quality standards. S. Rep.
No. 92-414 at 7, *reprinted in* 1972 U.S.C.C.A.N. at 3672; James Salzman & Barton H.
Thompson, Jr., Envtl. L. and Pol'y 141 (2d ed. 2007); *see also* Robert L. Glicksman & Matthew
R. Batzel, *Science, Politics, Law, and the Arc of the Clean Water Act*, 32 Wash. U. J. L. & Pol'y
099, 102-03 (2010). At the time of the passage of the CWA, half of the states had not adopted
standards and there was little to no implementation of limits or enforcement. *See* Glicksman*,
supra*, at 102*; see also EPA v. California ex rel. St. Water Resources Control Bd.*, 426 U.S. 200,
202-09 (1976); *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 870-71 (7th Cir. 1989). Congress
realized that a national strategy and system of requirements—a federal "floor"—would be
necessary to ensure that waters would be cleaned up and protected into the future. *See*
Glicksman, *supra*, at 102*.* Against this backdrop, Congress passed the CWA with the broad
purpose and intent to "restore and maintain the chemical, physical, and biological integrity of the
Nation's waters." 33 U.S.C. § 1251(a).

2.      *Congress Intended to Broadly Protect all "Waters of the United States."*

In developing a law that would provide more consistent and comprehensive protections to
waters across the Nation, Congress broadly defined "navigable waters" to mean "waters of the
United States." 33 U.S.C. § 1362(7). As the law's conference report emphasized, "the conferees
fully intend that the term 'navigable waters' be given the broadest possible constitutional
interpretation unencumbered by agency determinations which have been made or may be made

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

for administrative purposes." CONG. RESEARCH SERV., A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, Senate Consideration of the Rpt. of the Conference Committee at 178 (Oct. 4, 1972). In fact, the Senate Committee on Public Works "was reluctant to define" the term "navigable waters" based "on the fear that any interpretation would be read narrowly[,]" and it reiterated that it "fully intend[ed] that the term 'navigable waters' be given the broadest possible constitutional interpretation." *Id.* at 818.

In directing the broadest possible protections, Congress relied on science demonstrating the interconnectedness of waters and the need to ensure that aquatic ecosystems as a whole are protected in order to fulfill the Act's purpose, especially waters upstream of traditional navigable waters. Congress recognized that "[w]ater moves in hydrological cycles and it is essential that discharge of pollutants be *controlled at the source*." S. Rep. No. 92-414 at 77 (1971) (emphasis added).

Cattlemen's attempt to limit the Act's protection to only perennial tributaries and directly abutting wetlands conflicts with Congress' clear intent to broadly protect upstream waters and tributaries in order to ensure the integrity of downstream waters.

   B.   Justice Scalia's Plurality Opinion is not the Controlling Rule from *Rapanos*.

Cattlemen seek to enjoin the challenged provisions by asserting that the Scalia plurality is the lone rule of law that derives from *Rapanos*.[3] Mot 13-28. Not so. As explained below, the Ninth Circuit has specifically adopted Justice Kennedy's "significant nexus" test as the rule that came out of *Rapanos*. In addition, none of the Supreme Court cases cited by Cattlemen are on

---

[3] Cattlemen's confusing argument that issue preclusion dictates their success on the merits, Mot. 11-13, is inapplicable because neither the *Rapanos* court nor any other court has held that the Agencies lack the authority to protect the challenged waters under the CWA.

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

point or stand for the proposition that Justice Scalia's opinion alone controls, and none of the courts of appeals that have addressed the question have come to this conclusion.

In *Rapanos*, the Court remanded for further review the Corps' determination that certain wetlands adjacent to non-navigable waters were "waters of the United States." 547 U.S. at 729, 757, 759. A four-Justice plurality authored by Justice Scalia devised a jurisdictional test based on the permanence of flow, while again recognizing that the Act applies more broadly to waters beyond "traditionally navigable" waters. *Id.* at 757 (plurality opinion). Justice Kennedy's concurring opinion employed the "significant nexus" test, where waters are protected if they have a significant nexus to traditionally navigable waters. *Id.* at 759 (Kennedy, J., concurring in the judgment). The four dissenting Justices would have deferred to the Corps' existing regulations as the proper test, but they also would have protected waters that meet either Justice Kennedy or Justice Scalia's test. *Id.* at 810 (Stevens, J., dissenting).

Under the Supreme Court's *Marks* doctrine, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). The Ninth Circuit has directly addressed which opinion from *Rapanos* is the narrowest ground under the *Marks* doctrine. In *City of Healdsburg*, the Ninth Circuit found that Justice Kennedy's concurrence in *Rapanos*—not Justice Scalia's plurality opinion—controls under a *Marks* analysis. *Northern Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir. 2007). The Ninth Circuit held that because the "significant nexus" test is "the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases, . . . Justice Kennedy's concurrence provides the controlling rule of law[.]" *Id.* at 999–1000; *see also United States v. Moses*, 496

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

F.3d 984, 990 (9th Cir. 2007) (discussing Justice Kennedy's "opinion as the controlling rule of law"); *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 707 (9th Cir. 2007) (referring to Justice Kennedy's "controlling concurrence").

The Ninth Circuit's opinion in *United States v. Davis*, cited by Cattlemen, did not reach—and does not require— a different result. *Cf.* Mot. 15-26. There, the court adopted a "reasoning-based approach to applying *Marks*." *United States v. Davis*, 825 F.3d 1014, 1021 (9th Cir. 2016) (en banc). The court found:

> [W]hen applying *Marks* to a fractured Supreme Court decision, we look to those opinions that concurred in the judgment and determine whether one of those opinions sets forth a rationale that is the logical subset of other, broader opinions. When, however, no "common denominator of the Court's reasoning" exists, we are bound only by the "specific result."

*Id.* at 1028. The *Davis* court made no mention of the application of *Marks* to *Rapanos*.

In a case not cited by Cattlemen, the Ninth Circuit has considered and expressly rejected Cattlemen's argument that *City of Healdsburg* no longer controls as a result of *Davis*. In *United States v. Robertson*, the court held that *City of Healdsburg* "remains valid and binding precedent" after *Davis*. *United States v. Robertson*, 875 F.3d 1281, 1292 (9th Cir. 2017), *cert. granted, judgment vacated on other grounds*, 139 S. Ct. 1543 (2019). Specifically, the *Robertson* court found that *Davis* did not foreclose consideration of a dissent as the "broader opinion" in a *Marks* analysis, and in *Rapanos*, "[b]oth the plurality and Justice Kennedy's opinions can be viewed as subsets of Justice Stevens's dissent because both narrow the scope of federal jurisdiction." *Id*. The court went on to reaffirm that Justice Kennedy's concurrence "is narrower than the plurality opinion because it restricts federal authority less." *Id*. Though the decision in *Robertson* was vacated by the Supreme Court on unrelated mootness grounds, the Ninth Circuit's reasoning is persuasive and should be applied by this Court. *See United States v. Clark*, 617 F.2d

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

180, 184 n.4 (9th Cir. 1980) (holding that where reasoning on a precise issue is not invalidated

by a Supreme Court vacatur, it remains persuasive and may be adopted by subsequent courts).

Neither the Supreme Court nor any court of appeals has endorsed the Cattlemen's

misguided view that the narrowest holding is that which restrains federal jurisdiction to the

greatest extent. *See* Mot. 17-22. To the contrary, courts considering *Rapanos* have held that the

narrowest holding is the holding that restricts federal authority the least, or that would result in

the slightest change to the existing law. *See Rapanos*, 547 U.S. at 810 n.14 (Stevens, J.,

dissenting) ("I assume that Justice Kennedy's approach will be controlling in most cases because

it treats more of the Nation's waters as within the Corps' jurisdiction[.]"); *United States v.*

*Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) ("The issue becomes whether the definition of

'navigable waters' in the plurality or concurring opinions in *Rapanos* was less far-reaching (i.e.,

less-restrictive of CWA jurisdiction)."); *United States v. Gerke*, 464 F.3d 723, 724-25 (7th Cir.

2006) (finding that Justice Kennedy's "test is narrower (so far as reining in federal authority is

concerned) than the plurality's in most cases"); *see also United States v. Cundiff*, 555 F.3d 200,

209 (6th Cir. 2009) ("Marks does not imply that the 'narrowest' *Rapanos* opinion is whichever

one restricts jurisdiction the most.").

In addition to the Ninth Circuit, every other circuit court that has addressed the issue of

CWA jurisdiction following *Rapanos* has either applied *only* Justice Kennedy's "significant

nexus" analysis or found that waters that meet *either* Justice Kennedy's or Justice Scalia's

approach are "waters of the United States" protected by the CWA. *United States v. Bailey*, 571

F.3d 791, 799 (8th Cir. 2009); *see also Cundiff*, 555 F.3d at 210 (Sixth Circuit opinion finding if

either plurality or Justice Kennedy's test is met, there is a "water of the United States"); *United*

*States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006) (same); *Gerke*, 464 F.3d at 724 (Seventh

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-18-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

Circuit opinion looking to "significant nexus" standard as the governing standard); *Robison*, 505 F.3d at 1222 (Eleventh Circuit opinion noting same); *United States. v. Lucas*, 516 F.3d 316, 327 (5th Cir. 2008) (same); *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) (same); *Precon Dev. Corp., Inc. v. U.S. Army Corps of Engineers*, 633 F.3d 278, 289-90 (4th Cir. 2011) (parties agree and court adopts Justice Kennedy "significant nexus" test, approving of Corps definition of "adjacent").

In claiming otherwise, Cattlemen cite to a string of irrelevant Supreme Court decisions, none of which address the issue at hand. *See* Mot. 3-15. Many of the cases cited by Cattlemen do not even concern the CWA at all. Mot. 15. Those that do address the CWA and cite to the *Rapanos* plurality do so solely to support statements of fact rather than statements of law, to explain the case's procedural posture, or to allude briefly to dicta in the case. *See, e.g.*, *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016) (citing solely to statements of fact that appear in the *Rapanos* plurality, not to legal findings); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 625 (2018) (citing to statements of fact in the *Rapanos* plurality and explaining that the Supreme Court remanded the case); *see also PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012) (citing to Justice Kennedy's concurrence in *Rapanos*). None of the cases cited by Cattlemen state or suggest that the plurality is the controlling opinion from *Rapanos*. In fact, the Supreme Court has emphasized, post-*Rapanos*, that no single opinion in *Rapanos* commanded a majority of the Court. *See Sackett v. EPA*, 566 U.S. 120, 123-24 (2012).

Cattlemen also puzzlingly point to the Court's recent opinion in *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), to support its assertion that the Scalia plurality is the controlling *Rapanos* opinion. Mot. 13-15. But the Court in *Maui* did not even address the scope of "navigable waters" under the statute, much less decide which *Rapanos* opinion is

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-19-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

controlling. *See Cty. of Maui*, 140 S. Ct. at 1462. Therefore, Cattlemen's approach to *Rapanos* has no support in Supreme Court jurisprudence and would flout Ninth Circuit precedent and the conclusion of every other circuit that has addressed the controlling rule of law from *Rapanos*.

C.  <u>The Agencies have the Authority to Protect the Challenged Waters Under Either Justice Kennedy's Opinion or Justice Scalia's Opinion from *Rapanos*.</u>

Regardless of which test controls from *Rapanos*, Cattlemen are not likely to succeed on the merits because neither test precludes the Agencies from protecting the waters challenged by Cattlemen.

### 1.   *Justice Scalia Plurality*

Cattlemen argue they are entitled to a preliminary injunction because Scalia's plurality opinion controls, but they utterly fail to actually apply the opinion to the provisions they challenge, or otherwise explain why the opinion forbids protection of the challenged waters as defined in the rule. Just as well: even if Justice Scalia's test provided the controlling rule—which it does not—Cattlemen's legal position would still fail because Justice Scalia's plurality opinion simply does not address the precise regulatory definitions Cattlemen seek to enjoin here.

Under the standard outlined in Justice Scalia's opinion, tributaries fall within the scope of CWA when they are "relatively permanent, standing or flowing bodies of water." *Rapanos*, 547 U.S. at 732-33. Justice Scalia held, however, that the term "relatively permanent" does not exclude streams, rivers, or lakes that might dry up in extraordinary circumstance, nor does it exclude seasonal rivers that contain continuous flow during some months of the year but no flow during dry months. *Id.* at 733 n.5. Because Justice Scalia recognized the validity of protecting seasonal waters and specifically left open the question of "when the drying-up of a streambed is continuous and frequent enough to disqualify the channel as a 'wate[r] of the United States,'" his

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

test does not foreclose regulation of intermittent tributaries, defined in the rule as "surface water flowing continuously during certain times of the year and more than in direct response to precipitation (*e.g.*, seasonally . . .)." 85 Fed. Reg. at 22,338.

Similarly, to establish protections over wetlands under Justice Scalia's test, wetlands must have a "continuous surface connection" with a "water of the United States" such that they are adjacent to a protected water. *Rapanos*, 547 U.S. at 741-41. But the opinion did not preclude protection of the types of wetlands challenged here—connected wetlands that are separated by only natural features, or that have a surface connection in a typical year through an artificial feature or via floodwaters. Thus, the challenged regulatory provisions are not foreclosed by the Scalia plurality in *Rapanos*.

> 2.     *Justice Kennedy Concurrence*

Under Justice Kennedy's concurrence in *Rapanos*, the Agencies are well within their authority to protect the types of waters Cattlemen seek to exclude from the Act's scope. As previously explained, Justice Kennedy concluded that the Act protects waters with a "significant nexus" to waters traditionally considered navigable. 547 U.S. at 759, 787. Such nexus exists where the water, including wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780. Justice Kennedy acknowledged that so-called "isolated" wetlands may be protected by the Act, singly or in combination with similarly situated wetlands, as they may significantly affect other covered waters "more readily understood as 'navigable,'" and that the Corps may properly determine that proximity, volume of flow (annually or on average), or other relevant considerations form the foundation for protecting a wetland under the Act. *Id*. at 780. Similarly, Justice Kennedy noted

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION

-21-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

that wetlands separated by land from another waterway can be vital to that waterway: if such a wetland is destroyed, "floodwater, impurities, or runoff that would have been stored or contained in the wetlands" could instead "flow out to major waterways." *Id*. at 775. Justice Kennedy also described the plurality's attempt to impose a continuous flow requirement on tributaries as making little sense, because "torrents thundering at irregular intervals through otherwise dry channels," which could significantly affect downstream waterways, would then not be covered by the protections in the Act. *Id*. at 769. Justice Kennedy rightly gave effect to Congress' intent to have science, particularly hydrology, guide the application of the Act.

Cattlemen make the extraordinary argument that if this Court finds the Kennedy concurrence controls, the court should preliminarily order the Agencies to effectively rewrite the rule to require the Corps to make case-by-case jurisdictional determinations of CWA coverage for the waters they challenge, instead of allowing categorical protection. Mot. 28. Setting aside the propriety of such an unusual form of mandatory injunctive relief, Justice Kennedy clearly envisioned categorical protection of waters. *Rapanos*, 547 U.S. at 780-81. Justice Kennedy specifically concluded that waters could be shown to have a "significant nexus" on a categorical basis, and all water bodies within those categories should be protected, provided that the majority of waters in the class influence downstream water quality. *Id*. He explained that "[t]he Corps may choose to identify categories of tributaries that, due to their volume of flow (either annually or on average), their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, *in the majority of cases*, to perform important functions for an aquatic system incorporating navigable waters." *Id.* (emphasis added). This categorical approach follows that of the unanimous Court in *Riverside Bayview*, which noted:

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

> If it is reasonable for the Corps to conclude that *in the majority of cases*, adjacent wetlands have significant effects on water quality and the aquatic ecosystem, its definition can stand.  That the definition may include some wetlands that are not significantly intertwined with the ecosystem of adjacent waterways is of little moment, for where it appears that a wetland covered by the Corps' definition is in fact lacking in importance to the aquatic environment—or where its importance is outweighed by other values—the Corps may always allow development of the wetland for other uses simply by issuing a permit.

474. U.S. at 135 n.9 (emphasis added). The provisions challenged by Cattlemen follow this categorical approach to defining waters with a significant nexus to traditionally navigable waters, and are therefore consistent with and lawful under Kennedy's concurrence.

II.    CATTLEMEN FAIL TO SHOW HARM, MUCH LESS IRREPARABLE HARM, FROM THE CHALLENGED PROVISIONS.

In addition to demonstrating a likelihood of success on the merits, plaintiffs seeking a preliminary injunction must also demonstrate that irreparable harm is likely to result from the rule or application in question. *Cottrell*, 632 F.3d at 1134-35. As the Supreme Court has clarified, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (rejecting a "possibility of irreparable harm" standard). Injury sufficient to satisfy the irreparable harm standard must be actual and imminent, and it is the movant's burden to so demonstrate. *Cottrell*, 632 F.3d at 1135. "[S]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quotation marks omitted). Financial injury is also generally insufficient to support preliminary injunctive relief. *Goldie's Bookstore, Inc. v. Superior Ct. of St. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-23-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

A.    Cattlemen Have Not Demonstrated the Challenged Provisions Will Cause Any Harm.

Cattlemen seek an unusual cherry-picked partial injunction of a rule that already unlawfully and severely curtails protections afforded by the CWA. To support this extraordinary request for injunctive relief, Cattlemen provide no evidence of actual, specific harms that would occur in the absence of the requested preliminary injunction. Cattlemen's speculative and vague allegations are not sufficient to demonstrate any harm, let alone the kind of likely, imminent, and irreparable harm necessary to support a preliminary injunction.

Cattlemen's lone new declaration from Mr. Rosa is primarily an inadequate organizational declaration, addressing only the Cattlemen's interest in, and general dissatisfaction with, the challenged provisions, while providing no information about any discrete harm that could stem from the regulation of the challenged waters. Mr. Rosa's declaration is rife with unsupported, wildly general, and speculative assertions. Mr. Rosa states that he is "familiar with water features" on "properties throughout the state," "most" of which "have intermittent drainages and/or non-abutting wetland features." Rosa Decl. 3 ¶ 6, ECF No. 97-4. But Mr. Rosa fails to identify any specific example of such waters anywhere in the state. Mr. Rosa also claims, vaguely, that some of Cattlemen's members will potentially have to get permits for polluting unspecified waters on their properties. But even if Mr. Rosa had identified a specific water body that falls into one of the challenged categories, which he did not, CWA permits have generally been required for those types of waters for decades. *See* 44 Fed. Reg. at 32,901 (1979 regulations noting the protection of tributaries and adjacent wetlands). Therefore, the challenged rule, which imposes no new permitting requirements on these waters, cannot

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

possibly cause this kind of alleged harm, much less imminent harm.[4] Moreover, such permitting would constitute financial "harm" at most, which is generally insufficient to satisfy the irreparable harm standard. *Goldie's Bookstore, Inc.*, 739 F.2d at 472. Cattlemen have not, and cannot, credibly claim that any actual harm will imminently ensue absent the issuance of a preliminary junction in this case.

Cattlemen's confusing attempt to compensate for the inadequacy of its sole declaration by citing earlier declarations in this case allegedly demonstrating harm from an entirely different rule—the Clean Water Rule—fares no better. Mot. 31-33. These declarations are irrelevant to the present requested injunction because they do not address harm stemming from the provisions challenged by Cattlemen here. Even if they did address the Navigable Waters Rule provisions, which they do not, Columbia Riverkeeper has previously explained why they, too, failed to demonstrate imminent or irreparable harm caused by the Clean Water Rule. *See* Amicus Brief of Columbia Riverkeeper at 30-33, ECF No. 38; Supp. Amicus Brief of Columbia Riverkeeper at 3-6, ECF No. 48.

B.    Cattlemen Will Not Suffer Irreparable Constitutional Harm.

Without submitting any supporting declarations, Cattlemen assert that the challenged provisions inflict irreparable constitutional injury on its members simply because Cattlemen allege claims under the Commerce Clause and Tenth Amendment. Mot. 30-34. Cattlemen rely on

---

[4] It is generally recognized that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Thus, a plaintiff's delay may "undercut" its claim of irreparable harm. *Garcia*, 786 F.3d at 746. "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (internal quotation omitted).

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

little more than bare assertion to bolster its constitutional claims, falling far short of the clear

irreparable harm showing required. In any case, Cattlemen is wrong on the law because

the Constitution grants Congress authority to regulate interstate commerce, U.S. Const., art. I, §

8, and the challenged waters fall comfortably within this authority.

Congress's Commerce Clause authority unquestionably extends to the regulation of

waters that are themselves navigable—by definition, channels of commerce. *See Nat'l Fed'n of

Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (Congress may regulate "the channels of

interstate commerce"); *PPL Montana, LLC*, 565 U.S. at 592 (waters are "navigable in fact" when

they are or may be used "as highways for commerce"); *see also Utah v. United States*, 403 U.S.

9, 10-11 (1971) (waters may be "highways for commerce" even if not interstate); *United States

v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1325-26 (6th Cir. 1974) (water pollution is "a

direct threat to navigation"). By extension, the regulation of waters that significantly affect

navigable and interstate waters is also within the authority granted to Congress to regulate

channels of commerce. *See Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring) (explaining that

in *SWANCC*, the requirement of a "significant nexus" to navigable waters avoided constitutional

difficulties and federalism concerns); *id*. at 782-83 (citing Supreme Court case law

explaining, *inter alia*, that regulation of tributaries may be required in order to manage a

navigable water); *Ashland Oil*, 504 F.2d at 1326 (Congress may regulate non-navigable stretches

of a river to preserve commerce on the navigable portions); *id*. at 1326-28 (federal authority to

preserve navigable waters must extend to tributaries of such rivers, lest they become "a mere

conduit for upstream waste"). The waters challenged here have a significant impact on the

downstream channels of commerce, and therefore squarely fall within Congress's commerce

power. *See, e.g.*, 80 Fed. Reg. at 37,079 (explaining, for example, that "tributaries as a group

exert strong influence on the chemical, physical, and biological integrity of downstream waters . . . [t]hese significant effects on traditional navigable waters, interstate waters, and the territorial seas occur even when the tributary is small, intermittent, or ephemeral").

Cattlemen do not dispute these core principles and offer little to no argument on the merits of its Commerce Clause or Tenth Amendment claims, stating only that by alleging a Constitutional claim, they are presumably entitled to a preliminary injunction. That is not the law. *See, e.g.*, *Assoc. Gen'l Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991). Even if Cattlemen reasonably set forth a constitutional claim, that claim must be supported by facts and law, and it does not relieve Cattlemen of making a vigorous showing of irreparable harm tied to that constitutional claim.

III.    THE BALANCE OF HARMS AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF DENYING THE REQUEST FOR INJUNCTIVE RELIEF.

While Cattlemen fail to make a demonstration of actual and immediate harm, much less irreparable harm, from the challenged regulation, the pollution or destruction of many Oregon waterbodies that would result from this injunction is real, significant, imminent, and potentially permanent. The preliminary injunction standard requires that injunctions only be granted when "the balance of equities tips in their favor; and [] a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 19). However, the equities and public interest weigh heavily against an injunction in this case.

A.    The Harms Caused by the Unpermitted Pollution and Destruction of the Challenged Waters Would be Significant.

Cattlemen ask this Court to craft capacious new CWA loopholes for intermittent tributaries and many wetlands connected to other protected waters—waters that have generally

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

been protected by the Act for decades. If Cattlemen's requested injunction is granted, the harms

to Oregon waters caused by the removal of CWA protections would be profound.

If the Act does not apply to a tributary or wetland, the prohibitions on discharges of

pollution and dredge and fill activities, and the accompanying permitting processes, do not apply.

*See* 33 U.S.C. § 1311(a); 33 U.S.C. § 1342; 33 U.S.C. § 1344(a). Therefore, enjoining the

challenged provisions will result in these waters losing the protection of these permitting

programs, harming both the unprotected waters and downstream waters.

The Agencies' own economic analysis accompanying the Navigable Waters Rule already

predicts wide-ranging harms resulting from the rule, even without stripping protections for the

additional waters Cattlemen seek to carve out of the Act. For example, the analysis admits that

the expected increases in water pollution caused by the rule will, among other things, increase

sediment concentrations in waters, leading to increased needs for dredging of reservoirs and

drinking water treatment costs. *See* EPA, *Economic Analysis for the Navigable Waters*

*Protection Rule: Definition of "Waters of the United States,"* at 105, Fig. III-9 (Jan. 22, 2020),

*available at* https://www.epa.gov/sites/production/files/2020-01/documents/econ_analysis_-

_nwpr.pdf. The Agencies also explain that the reduction in protections could lead to less

stringent permit limits for point sources of pollution, which "could result in reduced protection

for aquatic ecosystems and public health and welfare." *Id*. at 106. The Agencies further

acknowledge that the newly unprotected ephemeral streams "support a variety of ecosystem

services," and are important for replenishing groundwater for irrigation and drinking water

supplies for communities in the arid western U.S. *Id*. at 107. The multitude of predicted

environmental and economic harms are summarized in the below figure from the Agencies'

economic analysis:

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-28-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*



**Fig. 1:** Illustration of predicted environmental and economic impacts from the Navigable Waters Rule. Source: EPA, *Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States*," at 105, Fig. III-9 (Jan. 22, 2020), https://www.epa.gov/sites/production/files/2020-01/documents/econ_analysis_-_nwpr.pdf

Despite these acknowledged environmental and economic harms from the Navigable Waters Rule, Cattlemen claim the rule should exclude even more waters from protection. Such a stripping of protections from significant additional categories of waters can only magnify and expand the harms predicted by the Agencies.[5]

---

[5] The harm would not be limited in scope. For example, according to one agency estimate based on National Hydrography Dataset figures, approximately 52% of streams across the country are intermittent. Public Comments of Sierra Club, et al. (April 15, 2019) at Ex. H, *available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11451.

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

Moreover, the harms to water quality in Oregon will be particularly pronounced, as more than half of all waterways in the state are intermittent or ephemeral. *See* Public Comments of the State of Oregon at 9 (April 15, 2019), *available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5412. In comments to the Agencies, Oregon has emphasized the importance of retaining protections for intermittent tributaries because they are critical to the water quality of downstream perennial waters and the recovery of endangered species, as well as to the state's important recreational, economic, and cultural interests in fish. *See id*. at 9-10. Oregon has also identified particular interests in maintaining protections for vernal pool wetlands, seasonal meadows and playas, and the remaining wetlands of the Klamath Basin because these waters support the threatened vernal pool fairy shrimp, Greater Sage-Grouse, and one of the largest concentrations of waterfowl in North America, respectively. *Id*. at 7-8.

> B.      The Preliminary Injunction is not in the Public's Interest Because the Public Interest is in Protecting Public Water Resources.

All citizens of Oregon, indeed all citizens of the nation, depend on and are entitled to clean and healthy waters for a multitude of uses. The Powder, Snake, and Columbia rivers are resources for irrigation and drinking water; for salmon and commercial, recreational, and subsistence fishing; for wildlife and livestock watering; and for all the other uses humans put waters to. It is this underlying public resource value that makes the protections in the CWA so fundamental and important. Even if Cattlemen had provided the Court with any evidence of harm, which they did not, when weighed against the identified and significant harms to Oregon waters, the scale plainly tips toward a protective approach for the good of the public as a whole.

In addition, the Ninth Circuit has directed that the public interest strongly favors preventing, not fostering, environmental harm. *Southeast Alaska Conserv. Council v. U.S. Army*

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-30-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

*Corps of Engineers*, 472 F.3d 1097, 1101 (9th Cir. 2006). Courts in this Circuit repeatedly find

that protecting against environmental harm, including protecting water from pollution,

profoundly outweighs financial interest or harm, even if the public has a stake in the financial

interest. *See Oregon State Public Interest Res. Grp. v. Pacific Coast Seafoods Co.*, 374 F. Supp.

2d 902, 908 (D. Or. 2005); *Idaho Conserv. League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148,

1162 (D. Id. 2012). Thus, even if Cattlemen's members have a financial interest in polluting or

destroying waters without permits, which they have not demonstrated, that interest would be

profoundly outweighed by the potential harm to those waters and to downstream waters.

CONCLUSION

Cattlemen's motion, which seeks an extraordinary form of mandatory preliminary

injunctive relief, fails to demonstrate a likelihood of success on the merits or irreparable harm to

Cattlemen, and would lead to the unpermitted pollution or destruction of untold numbers of

Oregon waters that are relied upon by the public. Columbia Riverkeeper respectfully requests

that this Court deny Cattlemen's motion for a preliminary injunction.


Respectfully submitted this 6th day of July, 2020.


/s/ Anna M. Sewell
ANNA M. SEWELL (WSBA #48736)
(Appearing *Pro Hac Vice*)
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500 | Phone
(202) 667-2356 | Fax
asewell@earthjustice.org

JANETTE K. BRIMMER (WSB # 41271)
(Appearing *Pro Hac Vice*)
Earthjustice

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340 (phone)
(206) 343-1526 (fax)
jbrimmer@earthjustice.org

JAMES NEVILLE SAUL (OSB #152809)
Earthrise Law Center
Lewis & Clark Law School
10015 S.W. Terwilliger Boulevard
Portland, OR 97219
(503) 768-6929 | Phone
(503) 768-6642 | Fax
jsaul@lclark.edu

*Attorneys for Intervenor-Defendant*
*Columbia Riverkeeper*

RESPONSE IN OPPOSITION TO PLAINTIFF'S
SECOND MOTION FOR PRELIMINARY INJUNCTION
-32-

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 9,397 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.


/s/ *Anna M. Sewell*
Anna M. Sewell

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.


*/s/ Anna M. Sewell*
Anna M. Sewell

*Earthjustice*
*1001 G Street NW, Suite 1000*
*Washington, DC 20001*
*(202) 667-4500*